**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Xavier McCLINTON, Donald Kelley, and
Andre McClinton, Defendants–
Appellants.**

**Nos. 96–3143, 96–3206 and 96–3229.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1997.

Decided Feb. 6, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied April 1, 1998.

Peggy A. Lautenschlager, Laura A. Przybylinski (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Morris D. Berman (argued), Giesen & Berman, Madison, WI, for Defendant–Appellant Xavier McClinton.

James C. Murray (argued), Madison, WI, for Defendant–Appellant Donald Kelley.

Ralph A. Kalal (argued), Kalal & Associates, Madison, WI, for Defendant–Appellant Andre McClinton.

Before CUMMINGS, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Three members of a Wisconsin drug trafficking conspiracy appeal their convictions and sentences. Xavier McClinton challenges the district court's rulings on the constitutionality of a warrantless search of his car, the denial of a mistrial motion for an incident of juror misconduct, the denial of a new trial motion for juror and prosecutorial misconduct at trial, the calculation of drug quantities attributable to him, his enhancement for

being an organizer of the conspiracy, and his enhancement for possession of a firearm in connection with the drug conspiracy. Donald Kelley questions the court's refusal to grant a mistrial or a new trial motion for the same incidents of juror and prosecutorial misconduct and the court's refusal to depart downward for his minimal role in the offense. Andre McClinton appeals the court's enhancement of his sentence for his role as an organizer of the conspiracy. For the reasons given below, we find no error in the district court's determinations and affirm the convictions and sentences of all three defendants.

## I. HISTORY

In the summer of 1995, the Dane County Narcotics and Gang Task Force began making controlled purchases of cocaine from Damon Henderson as part of an investigation into cocaine trafficking in that area of Wisconsin. After conducting several transactions through a confidential informant, law enforcement officials arrested Henderson. This arrest was carried out on August 12, 1995. Henderson was found to be in possession of two ounces of cocaine. A subsequent search of his residence revealed marijuana, another half ounce of cocaine, baggies, a firearm, and $5,060.

At the time of his arrest, Henderson agreed to cooperate with law enforcement. He provided a detailed description of the cocaine conspiracy in which he was involved for approximately one year. Xavier and Andre McClinton ran the organization. They received their cocaine from two Jamaicans, one of whom was Ian Haughton from Chicago, Illinois. Henderson also informed law enforcement that the McClintons periodically smuggled cocaine into the United States from Jamaica using young women as body couriers. The McClintons also used various methods of paying for the drugs. The normal method was for the McClintons to wire money as payment, but frequently the cocaine was fronted and then paid for with proceeds from its subsequent sale.

While law enforcement agents were debriefing Henderson in his apartment, surveillance officers outside reported that a red Cadillac, with license plates registered to Xavier McClinton, had arrived at Henderson's residence. Two men left the car and approached the apartment. Henderson met them outside and relayed the content of the conversation to the agents. The men were Xavier and Andre McClinton. According to Henderson, they came to collect $5,000 that Henderson owed them on an earlier front of cocaine. Law enforcement officials seized $5,060 from Henderson and replaced it with prerecorded currency which was returned so that Henderson could deliver it to either McClinton. After Henderson gave Xavier McClinton the money later in the day, Henderson reported back that Xavier McClinton was traveling to Chicago and back on August 13, 1995 to obtain some cocaine. The law enforcement officers responded by establishing surveillance along the suspected route.

They observed Xavier McClinton and a companion leave his residence and travel eastbound on I–90 toward Chicago. Based on the information Henderson provided, the officers believed that Xavier was on his way to Chicago to pick up another shipment of cocaine. They followed him in his red Cadillac south of Dane County to Chicago but lost him in the area of O'Hare Airport. Approximately five or six hours later, law enforcement officers observed Xavier McClinton traveling westbound on I–90 toward Madison, Wisconsin. Once the vehicle entered Dane County, they stopped Xavier and searched his car.

The agents did not find any controlled substance. They did, however, discover a bank bag that contained $16,000, including $4,500 of the prerecorded money that Henderson gave McClinton. The agents also found in the $16,000 two $20 bills that law enforcement officers had prerecorded and used in controlled purchases of cocaine in prior drug deals with Henderson before his arrest. The agents did not arrest Xavier McClinton at this time.

Given this partial success with Henderson, law enforcement officials continued to use him in controlled situations. On August 22, 1995, Henderson made a controlled purchase of 16 grams of cocaine from Andre McClinton. On August 23, 1995, Henderson made a second controlled purchase from Andre McClinton. Henderson wore a bodywire on

both occasions. On September 15, 1995, Henderson made a third controlled purchase from Andre McClinton. All three of these purchases were fronted.

On September 19, 1995, agents provided Henderson with $600 in prerecorded currency to pay Andre McClinton for some of the previously fronted cocaine. Henderson then met with both Andre and Xavier McClinton. He later reported that he paid Andre for the fronted cocaine and that Andre did not keep the money but immediately pushed it to Xavier McClinton.

Law enforcement officials then concluded that they had sufficient evidence to arrest the members of the McClinton drug conspiracy. On October 10, 1995, Donald Kelley and Andre McClinton delivered 5.5 ounces of cocaine to Henderson. The next day, Henderson met with Andre McClinton to pay his balance for the cocaine. Andre McClinton was arrested at this time.

Subsequently, Donald Kelley, Ian Haughton, and Xavier McClinton were arrested. In the search of Xavier McClinton's apartment, agents found a Tec–9 semi-automatic assault rifle as well as a locked bank bag containing $15,550. In a search incident to Ian Haughton's arrest, agents found a set of keys which included a key to the bank bag in Xavier McClinton's apartment.

On December 20, 1995, following an earlier complaint and indictment, the grand jury for the Western District of Wisconsin returned a six-count superseding indictment against the defendants. Count I charged Xavier McClinton, Andre McClinton, Donald Kelley, and Ian Haughton with conspiring to distribute cocaine. Counts II, III, and IV charged Andre McClinton with distributing cocaine. Count V charged Andre McClinton and Donald Kelley with distributing cocaine. Count VI was a criminal forfeiture action. On December 22, 1996, the defendants entered not guilty pleas to the superseding indictment.

Two of the defendants, however, had a change of heart. On May 31, 1996, Ian Haughton pled guilty. He was sentenced on August 20, 1996 to a term of imprisonment of 70 months. He did not file an appeal.

On June 3, 1996, Andre McClinton entered a guilty plea to Count I of the superseding indictment. The court conditionally accepted the guilty plea pending review of the presentence investigation report. At sentencing, the district court enhanced Andre McClinton's offense level by four levels under § 3B1.1 of the United States Sentencing Guidelines ("U.S.S.G.") for his leadership role in the cocaine conspiracy. On August 20, 1996, the court sentenced Andre McClinton to a term of imprisonment of 168 months.

Xavier McClinton and Donald Kelley did not change their not guilty pleas. Prior to trial, these defendants submitted a number of pretrial motions including a motion to suppress evidence seized from Xavier McClinton's vehicle on August 13, 1995. McClinton argued that the law enforcement officers did not have probable cause to make the warrantless stop. Magistrate Judge Stephen L. Crocker issued a report and recommendation to deny the defendant's motion to suppress the evidence. Judge Crabb accepted this report and recommendation and denied the motion to suppress.

The trial of Donald Kelley and Xavier McClinton began on June 3, 1996, and four days later, both were found guilty. The district court sentenced Xavier McClinton to a term of imprisonment of 188 months. In calculating his base offense level, the court determined that he was involved in a conspiracy which was responsible for 3.5 to 5 kilograms of cocaine. It then enhanced this sentence level by four under § 3B1.1 of the Sentencing Guidelines for his leadership role in the conspiracy. Also, based on the discovery of a bank bag with $15,500 and a Tec–9 semi-automatic assault rifle with a loaded magazine found nearby, the court enhanced Xavier McClinton's offense level by two points for his possession of a gun in connection with a drug offense under § 2D1.1(b)(1) of the Guidelines. The court sentenced Donald Kelley to a term of imprisonment of 115 months, rejecting his claim of a minimal role in the offense.

Xavier McClinton, Andre McClinton, and Donald Kelley appeal to this Court.

## II. ANALYSIS

The defendants raise a panoply of arguments in this appeal from suppression of

evidence to sentencing violations; we address all the meritorious issues.

### A. Warrantless Search of Xavier McClinton's Car

■ Xavier McClinton submits that law enforcement officers violated his Fourth Amendment rights when they stopped and searched his car. As a result, he asserts that the district court should have suppressed all evidence obtained directly from those acts as well as any evidentiary leads derived from the evidence found. The district court denied Xavier McClinton's motion to suppress based on its finding that probable cause existed to believe that his vehicle contained contraband. We review that determination *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996) (stressing that while "as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal[,] a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers").

■ In *Carroll v. United States*, 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925), the Supreme Court recognized a "moving vehicle" exception to the warrant requirement of the Fourth Amendment. Under this exception, police officers may search a vehicle without a warrant if they have probable cause to believe it contains contraband or evidence of a crime. *See California v. Acevedo*, 500 U.S. 565, 569, 111 S.Ct. 1982, 1985–86, 114 L.Ed.2d 619 (1991); *California v. Carney*, 471 U.S. 386, 390–94, 105 S.Ct. 2066, 2068–71, 85 L.Ed.2d 406 (1985); *United States v. Ortiz*, 84 F.3d 977, 983 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 250, 136 L.Ed.2d 177 (1996); *United States v. Young*, 38 F.3d 338, 340 (7th Cir.1994).

■ The Supreme Court has also recognized that it is not possible to articulate an exact definition of "probable cause" or "reasonable suspicion" as they are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Ornelas*, at 696, 116 S.Ct. at 1661. At the same time, though, the Court noted that probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.*; *see also Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964). Thus, probable cause exists if, under the totality of the circumstances, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

In *Gates*, the Supreme Court held that a highly detailed tip from an anonymous informant that was corroborated by independent police work is sufficient to establish probable cause to search. *See id.* at 246, 103 S.Ct. at 2336; *see also Acevedo*, 500 U.S. at 579–80, 111 S.Ct. at 1990–91. In *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the Court then provided the proper approach for analyzing the reliability of a tip:

> [I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The *Gates* Court applied its totality-of-the-circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work.

*White*, 496 U.S. at 330, 110 S.Ct. at 2416.

Xavier McClinton argues that the police were not permitted to rely solely on Henderson to establish probable cause because he was not correct in all of his statements. Specifically, he highlights the fact that Henderson initially believed that Xavier McClinton was not in Wisconsin. Yet, we do not require an informant to be correct 100% of the time. *See Gates*, 462 U.S. at 245, 103 S.Ct. at 2335–36. The law enforcement officers knew that Henderson was selling cocaine from personal experience in their prior purchases. And during the debriefing,

Henderson admitted he participated in a drug trafficking conspiracy with Xavier and Andre McClinton. Then, almost as if on cue, Xavier and Andre McClinton appeared to collect the money Henderson owed them from previous fronts of cocaine. These facts provided a solid basis for the police to investigate Henderson's other statements.

Xavier McClinton also suggests that Henderson was completely unreliable because he was a wholly untested first time informant. This suggestion, however, is not consistent with the facts of this case. The police tested Henderson's information as they followed McClinton.

Just like the tips in *White* and *Gates*, Henderson's tip contained specific details about Xavier McClinton's future actions that were not easily predicted. He predicted that McClinton would travel to Chicago and back within the next twenty-four hours. This information together with his own admissions about traveling to Chicago with McClinton to retrieve drugs demonstrated that Henderson had "inside information." *White*, 496 U.S. at 332, 110 S.Ct. at 2417; *see also Gates*, 462 U.S. at 245, 103 S.Ct. at 2335–36; *Navarro*, 90 F.3d at 1253. Once confirmed by surveillance, Henderson's statements converted the driving trip, a seemingly innocent activity, into a suspicious one. *See Gates*, 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13.

Thus, taking into account Henderson's veracity, reliability, and basis of knowledge, we believe that Henderson proved himself to be reliable about the trip to Chicago and " 'more probably right about other facts,' " *see Gates*, 462 U.S. at 244, 103 S.Ct. at 2335 (quoting *Spinelli v. United States*, 393 U.S. 410, 427, 89 S.Ct. 584, 594, 21 L.Ed.2d 637 (1969) (White, J., concurring)), like the fact that there was cocaine in McClinton's car. *See Navarro*, 90 F.3d at 1253–54 (affirming denial of suppression motion where subsequent surveillance of drug traffickers' travels verified an informant's tip). We therefore conclude that Henderson's detailed tip once corroborated by independent police work provided probable cause for the law enforcement officers to stop McClinton's car and search it, thereby satisfying the requirements of the Fourth Amendment.

### B. Juror Misconduct

Donald Kelley and Xavier McClinton also claim that the district court abused its discretion in denying their motions for a mistrial following the discovery of inappropriate statements made by two jurors. Specifically, they challenge the use of voir dire as an insufficient means of purging the remaining jurors of racially biased statements expressed by another juror. They also argue that the court abused its discretion by allowing a biased juror to remain on the panel.

### 1.

On June 6, 1996, as the jury adjourned for a break, a juror initiated a conversation about a woman seated in the spectator section of the courtroom. Another juror noticed that she was with defendant Kelley. Someone else had seen her with defendant McClinton the previous day. Overhearing this exchange, a male juror turned to another juror and said, "They probably share her like the coke." In response, another juror said, "like a commodity." Then, the juror who made the "sharing" comment turned to the jurors discussing the female spectator and said, "They do that, you know. That's what they do."

Juror Gavinski reported the incident that evening by letter to Judge Crabb. Although the word "they" is ambiguous without an antecedent, juror Gavinski interpreted the word "they" to mean African-Americans. She also alertly noticed that the "like the coke" comment suggests that at least one juror predetermined Kelley's and Xavier McClinton's guilt.

In response to this juror misconduct, defense counsel moved for an immediate mistrial. They viewed the remark as evidence that these jurors could not keep an open mind about the case and showed that these jurors lied during the initial voir dire in their responses to questions about bias concerning African–Americans. Defense counsel collectively argued that no amount of admonishment or curative instruction could purge this taint of bias.

The court elected to question each of the jurors individually, admitting "this is as seri-

ous as anything that I have been faced with." Judge Crabb then questioned the jurors whether they had any personal knowledge of the conversation, heard any other statements of this sort, shared any of these beliefs about African–Americans, or had any bias or prejudice toward African–Americans. The court also inquired whether the statements influenced the jurors in any way; whether they could keep an open mind about the defendants' guilt or innocence; and whether they could not be impartial for any reason. During its questioning, the court encouraged counsel on both sides to ask questions of the jurors as well. At various times, counsel supplemented the court's questioning with their own.

Through this questioning, the court learned that juror Davis made the "sharing" comment as well as the "that's what they do" remark, and juror Goepfert said "like a commodity." Juror Davis admitted that he was a party to the conversation, but he did not remember what exactly he said, what the rest of the conversation was, or the context in which the conversation arose. At the end of this second voir dire, the court was unable to conclude that juror Davis was honest and sincere in his statements that he could judge this case fairly. Thus, the court removed juror Davis and replaced him with an alternate juror.

Juror Goepfert also admitted that he made the commodity remark. He then had the following exchange with Judge Crabb in explaining this statement:

THE COURT: Were you referring to African–Americans in general when you said this?

JUROR GOEPFERT: Not necessarily.

THE COURT: To what were you referring?

JUROR GOEPFERT: Just a girlfriend-boyfriend thing. I don't know how else to explain it.

THE COURT: Do you believe that African–Americans tend to pass their girlfriends around?

JUROR GOEPFERT: No.

THE COURT: Do you believe that these particular defendants tend to pass their girlfriends around?

JUROR GOEPFERT: Not necessarily, your Honor. I was joking. I didn't really mean anything by it. I just made a stupid comment.

Trial Tr. at 19, *United States v. McClinton*, 95 CR 87 (W.D. Wis. June 7, 1996). Juror Goepfert then confirmed that there were no other comments of this nature or other discussions of the testimony. He reiterated that he could keep an open mind and be impartial, even though the defendants were of a different race than he. He also stated that he had not made up his mind about the defendants' guilt or innocence. In closing its inquiry of this juror, the court admonished him again about the seriousness of this conduct and the seriousness of his comments, stressed to him the importance of not discussing the case, and directed him not to say anything about this inquiry to anyone else.

At the close of the second voir dire, the court concluded that juror Goepfert could remain a juror. Judge Crabb specifically noted:

> I think it's clear that he realized it was the wrong thing to do. I believe that he can put aside his feelings and deliberate fairly and impartially in this case. And I believe that all the other jurors can too.

*Id.* at 41. The court reasoned that excusing juror Davis together with its examination of the jurors and a readmonishment about the importance of keeping an open mind and not allowing race or any other characteristic to influence them improperly would be enough to purge the jury of the statements' racial bias. She believed "the answers that the other jurors gave indicate that they could be impartial and that they will be impartial and that they will consider this case fairly." *Id.* at 43. The court then denied defense counsel's request for a mistrial.

### 2.

 The Fifth and Sixth Amendments protect a criminal defendant from a jury's lynch mob mentality through the guarantees of due process of law and trial by an impartial jury. U.S. Const. amends. V, VI. "Impartiality is not a technical conception. It is a state of mind." *United States v. Wood*, 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78

(1936) (Hughes, C.J.). The test for determining impartiality in a prospective juror is whether he can "'lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). Due process, however, does not require a new trial "every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Rather, due process consists of a jury able to decide the case solely on the evidence before it and a trial judge "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* at 217, 102 S.Ct. at 946.

In deciphering what due process requires, this Court has distinguished between an extraneous contact that may have affected a jury's ability to remain fair and impartial and an intrinsic influence from a juror's pre-existing bias. If outside contacts may have affected the jury, due process requires some form of hearing. *See Willard v. Pearson*, 823 F.2d 1141, 1148 (7th Cir.1987) (citing *Smith*, 455 U.S. at 215, 102 S.Ct. at 944). The tool for examining an intrinsic influence like juror bias, however, is a voir dire. *See Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1141 (7th Cir.1992); *see also United States v. Sotelo*, 97 F.3d 782, 796 (5th Cir.1996), *cert. denied*, ─── U.S. ───, 117 S.Ct. 1002, 136 L.Ed.2d 881 (1997) (recognizing that the Fifth Circuit had provided trial courts with broader discretion in resolving juror misconduct involving intrinsic influences than extrinsic ones).

In an ongoing proceeding, the proper method of challenging whether a jury is impartial and due process has been served is use of a motion for mistrial. Our system of justice, however, "has not delegated to every reprobate the power to effect a mistrial." *United States v. Williams*, 737 F.2d 594, 612 (7th Cir.1984). Trial courts have wide discretion in deciding this sort of motion. *See United States v. McAnderson*, 914 F.2d 934, 944 (7th Cir.1990); *United States v. Verkuilen*, 690 F.2d 648, 658 (7th Cir.1982).

The response to such a motion varies by the content of the allegations, including the seriousness and likelihood of the alleged bias and the credibility of the source. Among the court's discretionary powers is the authority to replace jurors with alternates where circumstances so demand. *See McAnderson*, 914 F.2d at 944. The ultimate inquiry is whether a substantial likelihood exists that the criminal defendants were denied a fair trial. *See United States v. Sanders*, 962 F.2d 660, 672 (7th Cir.1992).

The Supreme Court has suggested that "compelling institutional considerations" require us to afford deference to the trial court as the lower court has the primary responsibility to evaluate possible influences on the jury. *Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978). A decision to deny a motion for mistrial based on juror bias therefore is reviewed according to an abuse of discretion standard. We will review questions of law de novo, but, as an appellate court sitting one step removed from the trial, we will reverse the district court's decision only if we have a strong conviction of error. *See Sanders*, 962 F.2d at 669.

### 3.

To resolve Kelley's and Xavier McClinton's challenges of juror misconduct, we must answer two questions. The first is whether the trial court abused its discretion by allowing juror Goepfert to remain a juror. The second is whether the court abused its discretion by not declaring an immediate mistrial because voir dire is an insufficient mechanism to purge the remaining jurors of the taint of racial bias expressed by another juror. We answer both in the negative because the district court responded appropriately in a difficult situation.

Juror Goepfert used the comment "like a commodity" to describe how he assumed Kelley and McClinton treated the spectator. In his statements to the court, he attempted to distance himself from the remark. Kelley and McClinton argue that these later statements are inherently suspect and should be given little weight. Contrary to the defendants' request, however, we may

not disregard juror Goepfert's subsequent statements in the second voir dire as inevitably suspect. *See Smith*, 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7 (reasoning that "surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter") (quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950)).

Kelley and Xavier McClinton also rely on *United States v. Heller*, 785 F.2d 1524 (11th Cir.1986), to argue that voir dire is never sufficient to handle statements of invidious religious or racial bias made by jurors. In *Heller*, a case involving the trial of a Jewish attorney for tax evasion and falsely subscribing to an income tax return, the trial court learned of jurors previously making anti-Semitic statements while the jury was deliberating. These statements included one juror at the beginning of the trial suggesting they hang the defendant and "gales of laughter" in response to numerous anti-Semitic jokes and comments. *Id.* at 1526. In response, the district court questioned the jurors individually in an attempt to "get rid of the taint that we have seen here." *Id.* at 1525. After concluding his questioning, the court asked the jurors to confirm their promises to ignore "these extraneous outside matters that we have discussed." *Id.* at 1526. The jurors continued their deliberations and returned a guilty verdict ninety minutes later. *See id.* at 1527.

The Eleventh Circuit reversed and remanded the case for retrial. That court viewed the district court's voir dire as superficial at best. *See id.* Jurors were never asked what they meant by their comments. Instead, the trial court simply asked the jurors whether they were affected by prejudice. *See id.* The appellate court stressed that "[t]he religious prejudice displayed by the jurors ... is so shocking to the conscience and potentially so damaging to public confidence in the equity of our system of justice, that we must act decisively to correct any possible harmful effects on this appellant." *Id.* at 1527. That court concluded that the jurors who made the anti-Semitic comments together with the others who reacted together with "gales of laughter" displayed the type of bigotry that denied the

defendant his constitutional right to trial by an impartial jury. *Id.*

While *Heller* is insightful on this issue of juror misconduct, we disagree with the suggestion of the defense that the *Heller* court held that even a thorough second voir dire would be insufficient to uncover a juror's deep-seated bias. The Eleventh Circuit never stated that proposition. *See United States v. Caporale*, 806 F.2d 1487, 1505 n. 22 (11th Cir.1986) (emphasizing that *Heller* did not establish "a per se rule to that effect"). Instead, the court in *Heller* held that "a mistrial is warranted where it appears that ethnic bias on the part of the jury influenced the verdict, and that ethnic jokes can serve as a basis for finding ethnic bias." *Id.* We do not question *Heller*'s holding. The *Heller* court concluded that the trial court's second voir dire was "superficial" and did not confirm that religious or ethnic bias did not affect the jury's decision. 785 F.2d at 1527. Thus, the issue for us is whether the district court's voir dire was sufficient to ensure that racial bias did not influence the verdict.

In this regard, our situation is more analogous to the one that then Judge, now Justice, Breyer encountered in *Tavares v. Holbrook*, 779 F.2d 1 (1st Cir.1985). In *Tavares*, a habeas appeal, jurors heard other jurors refer to an African–American defense witness by the stereotypical name, "Sapphire." *See id.* at 2. To remedy the situation, the trial judge questioned the jurors individually. This second voir dire was held out of the hearing of the other jurors but in the presence of counsel, who were free to ask questions. *See id.*

During the questioning, the court "sought to elicit precisely who had said what, who had heard what, whether the remarks reflected prejudice, and whether each juror would remain willing and able to deliberate free from any taint of racial bias." *Id.* In the end, the trial judge denied the defense's motion for a mistrial, concluding that the Sapphire remark would not significantly interfere with the jury's ability to decide the case impartially. *See id.*

Judge Breyer began his analysis by noting that "a racial slur is not automatically rendered harmless simply because it is intended

as benign." *Id.* The use of a racial slur may confirm an African-American defendant's fear that white jurors were "acting with a racial caricature in mind. If such a caricature were to interfere substantially with an objective evaluation of the evidence, it could render the trial unfair." *Id.* at 3.

The First Circuit concluded, however, that the trial court's response was sufficient to satisfy the defense's concerns of racial bias. It believed that the trial court did not abuse its discretion in denying the mistrial motion after interviewing the jurors individually, in detail, and in a manner where counsel had a full opportunity to participate. *See* id. at 3. This thorough investigation together with the sworn statements that the juror could remain impartial were sufficient support for the lower court's conclusion that any juror bias would not affect the verdict. Thus, the First Circuit affirmed.

Like the trial court in *Tavares*, the district court here questioned each of the jurors individually, in detail, and in a manner that allowed counsel to participate. The court specifically questioned both parties to the conversation about the meaning of their statements and their ability to remain impartial. While others may interpret juror Goepfert's difficulty in articulating the meaning of his comment and his reluctance in confronting his own bias as evasive conduct, the district court viewed it as a good faith attempt to admit the seriousness of his comments as he realized the damaging impact of what he considered a joke, a stupid comment. The trial court was not as sympathetic with juror Davis, who could not recall the language he used or the context of the conversation. After evaluating each juror's demeanor and credibility, the court dismissed juror Davis but concluded that juror Goepfert could remain on the panel and that the remaining jurors were not tainted by juror Davis's comments. Judge Crabb's resolution was a reasonable response to a difficult situation. It therefore was not an abuse of her discretion. *See United States v. Davis*, 15 F.3d 1393, 1415 (7th Cir.1994) (deferring to trial court's evaluation of demeanor in refusing to dismiss juror); *Artis*, 967 F.2d at 1143 (affirming trial court's conclusion to retain potentially biased juror on the panel); *Williams*, 737 F.2d at 612 (deferring to trial court's evaluation of credibility in refusing to dismiss juror).

Kelley and Xavier McClinton also contend that mere exposure to another juror's racial bias is enough to taint the jury and that the remaining jurors' refusal to report the misconduct is evidence that the other jurors condoned or accepted this type of conduct. They believe that a trial court must declare a mistrial if jurors overhear any statement motivated by racial bias while serving on the panel. We reject this contention.

The standard of impartiality is whether a juror can set aside an impression or opinion and decide a case solely on the evidence presented in court. *See Murphy*, 421 U.S. at 800, 95 S.Ct. at 2036. If we accepted the defense's argument, then we would be saying that this Court does not believe that jurors can set aside a statement they have heard or an impression they have. We believe this notion underestimates a vast number of potential jurors. The tool of voir dire has the power to ferret out jurors who cannot render a verdict based on the evidence. No court of appeals has established a per se rule that district courts must declare a mistrial in this situation, and we refuse to do so today.

### C. Prosecutorial Misconduct

Third, Kelley and Xavier McClinton claim they deserve a new trial as a remedy for the prosecutor's misconduct in his closing argument. This Circuit applies a two-part test for assessing allegations of improper government conduct in closing arguments. "First, we consider the prosecutor's disputed remarks in isolation to determine whether they are improper. If so, we then consider the remarks in the context of the entire record and assess whether they had the effect of denying the defendant a fair trial." *United States v. Lindemann*, 85 F.3d 1232, 1244 (7th Cir.) (citing *United States v. Johnson–Dix*, 54 F.3d 1295, 1304 (7th Cir.1995)), *cert. denied,* —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996). To merit awarding a new trial, the comments must infect the trial with unfairness to such a degree as to " 'make the resulting conviction a denial of due process.' " *United States v. Akinsanya*, 53 F.3d 852, 857 (7th Cir.1995) (quoting *Dar-*

*den v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

█ In determining the effect on the fairness of the trial, we consider: 1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel; 3) whether the trial court's instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant. *See United States v. Butler,* 71 F.3d 243, 254 (7th Cir.1995); *United States v. Osuorji,* 32 F.3d 1186, 1191 (7th Cir.1994); *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.1993).

█ Kelley and Xavier McClinton argue that the Assistant United States Attorney ("AUSA") made blunt assertions of facts not in evidence in his closing argument. During the prosecution's case-in-chief, the AUSA wanted Henderson to discuss his August 12, 1995 statements to law enforcement officers that the McClinton conspiracy used women to transport cocaine in their bodies from Jamaica. The district court sustained defense counsel's objections to the attempts to elicit this testimony from Henderson. In his closing argument, however, the AUSA twice mentioned that Henderson had provided this information to law enforcement officials. Both times defense counsel objected, and the court sustained the objections.

When viewed in isolation, these remarks are improper. Trial lawyers know that their closing arguments must be confined to the evidence and reasonable inferences that may be drawn from the evidence. *See generally* 3 Charles Alan Wright, *Federal Practice and Procedure: Criminal* § 555 (2d ed.1982). Here, it appears that the AUSA attempted to bolster the credibility of a key witness through the use of prior consistent statements to law enforcement that were not in evidence.

But even assuming the prosecution did attempt to bolster a witness through prior consistent statements not in evidence, Kelley and Xavier McClinton do not merit a new trial. They have not demonstrated that they were denied a fair trial when these statements are placed in the full context of the record. *See Lindemann,* 85 F.3d at 1244.

Both Henderson and the women who carried the cocaine into the United States testified to the facts surrounding the trips to Jamaica. Also, the district court took steps to limit any prejudicial impact of the improper statements. During the government's closing, the court reminded the jury that they heard the evidence and that if they thought the evidence was being mischaracterized by the prosecutor, they could disregard what the prosecutor said. It also provided the jury with an instruction specifically indicating that statements by the attorneys were not evidence. *See Doe v. Johnson,* 52 F.3d 1448, 1458 (7th Cir.1995) ("Jurors are presumed to follow ... instructions ....") (quoting *Crossley v. General Motors Corp.,* 33 F.3d 818, 822 (7th Cir.1994)); *Davis,* 15 F.3d at 1402 (" 'We rely on our belief that juries heed the instructions.' ") (quoting *United States v. Severson,* 3 F.3d 1005, 1015 (7th Cir.1993)). Finally, the evidence concerning the guilt as to the conspiracy charges was overwhelming against both Xavier McClinton and Kelley. Such strong evidence of guilt "eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *United States v. Young,* 470 U.S. 1, 19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). We therefore hold that the prosecutor's comments concerning Henderson's prior statements did not " 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

Thus, this Court affirms Donald Kelley's and Xavier McClinton's convictions. We will now turn to the sentencing issues.

### D. Role in the Offense

#### 1. Reduction for Minimal Participant in the Conspiracy

█ Kelley alleges that the district court erred in refusing to grant him a reduction in his sentence level under U.S.S.G. § 3B1.2 for his mitigating role in the McClinton drug conspiracy. He claims that he is just a "flunky" with a drug habit who did odd jobs and chores for the McClintons and that his

resulting culpability was substantially less than the McClintons'.

Sentencing Guideline § 3B1.2 instructs a court to decrease the offense level of a defendant by four levels if he was a minimal participant in a criminal activity and decrease by two levels if he was a minor participant. *See* U.S.S.G. § 3B1.2(a), (b). A "minimal participant" is someone who is "plainly among the least culpable of those involved in the conduct of a group," U.S.S.G. § 3B1.2, comment. (n.1), whereas "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal," U.S.S.G. § 3B1.2, comment. (n.3).

When a defendant requests a decrease in his offense level, he has the burden of demonstrating his eligibility for the reduction by a preponderance of the evidence. *See United States v. Beltran*, 109 F.3d 365, 370 (7th Cir.) (quoting *United States v. Nobles*, 69 F.3d 172, 190 (7th Cir.1995)), *cert. denied*, ___ U.S. ___, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997). This determination is "heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, comment. (backg'd). A district court's conclusion in this area therefore is reviewed for clear error. *See United States v. Lewis*, 79 F.3d 688, 690 (7th Cir.1996).

Kelley believes that his role as a courier is enough to ensure his status as a minimal or minor participant in the conspiracy. We disagree. A defendant is not eligible for this reduction "just ... by being a courier, or by serving as a go-between rather than a principal." *Beltran*, 109 F.3d at 370 (quoting *United States v. Willis*, 49 F.3d 1271, 1275 (7th Cir.1995)). That status does not automatically make him less culpable than the other participants, especially when more than one drug transaction occurred. *See United States v. Osborne*, 931 F.2d 1139, 1157–59 (7th Cir.1991) (transporting eleven ounces of cocaine in two separate trips indicates defendant played an integral role in conspiracy). Instead, the question is whether the defendant's role in the crime of conviction was minor or minimal. *See Willis*, 49 F.3d at 1275 (7th Cir.1995). The defendant must be substantially less culpable than the average participant in order to warrant a reduction under § 3B1.2. *See United States v. Boat-*

*ner*, 99 F.3d 831, 838 (7th Cir.1996); *United States v. Jones*, 55 F.3d 289, 293 (7th Cir. 1995).

Kelley was a driver for the McClintons for about a year. He admitted that he was paid a flat fee to deliver drugs for the McClintons. On average, Kelley delivered drugs once per week but sometimes more. In addition, Kelley made repeated trips to Chicago to pick up cocaine for Xavier and Andre McClinton from the Jamaicans. On some of these trips, Kelley transported money to Chicago, and at other times, he wired money. Kelley also admitted that he made one trip to California to pick up cocaine for the McClintons.

The district court viewed Kelley as an average participant in the conspiracy, not a minor one. Kelley was certainly less culpable than Xavier McClinton and Andre McClinton, but his role was not such that he merited a downward departure for minimal participation. He was too intertwined with the daily operation of the conspiracy. *See United States v. Yoon*, 128 F.3d 515, 529 (7th Cir.1997) (concluding that highly involved participants are not minor or minimal). The court concluded that Kelley was one of the essential participants that made this conspiracy work, and for that reason he did not warrant any kind of downward adjustment of his offense level. *See* Sentencing Hr'g Tr. at 18, *United States v. McClinton*, 95 CR 87 (W.D.Wis. August 23, 1996).

We agree. Kelley's reduced role in the conspiracy in comparison to the McClintons' role is reflected in the fact that his offense level was not increased for being an organizer or manager. *See Beltran*, 109 F.3d at 371 (refusing to depart downward where minor role was reflected in minor nature of the charges pending). Kelley has failed to explain why he should not be considered to be an average participant; the evidence presented at trial established him as an integral component in this drug conspiracy. We therefore hold that the district court did not commit clear error in refusing to reduce Kelley's offense level for his role in the conspiracy.

### 2. Enhancement for an Organizer of the Criminal Conspiracy

Both Xavier McClinton and Andre McClinton claim that the district court clearly erred when it enhanced their offense level by four levels after determining that the McClintons were organizers or leaders. They argue that they deserve at most a three-level enhancement for managing the conspiracy. *See* U.S.S.G. § 3B1.1(b).

Section 3B1.1(a) of the Sentencing Guidelines provides that a defendant's offense level should be increased by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether a defendant is an organizer or leader, courts have considered a defendant's exercise of decision-making authority, the nature of his participation in committing the crime, his recruitment of accomplices, his claimed right to a larger share of the criminal proceeds, his exercise of control and authority over others, and the nature and scope of the illegal activity. See U.S.S.G. § 3B1.1, comment. (n.4); *see also United States v. Emerson*, 128 F.3d 557, 562 (7th Cir.1997). Not all of these factors need be present, however, for a court to enhance a sentence under § 3B1.1. *See United States v. Akinrinade*, 61 F.3d 1279, 1289 (7th Cir.1995).

We review a district court's finding underlying an enhancement for a defendant's aggravating role for clear error. *See United States v. Lewis*, 79 F.3d 688, 690 (7th Cir.1996). Where there are two possible views of the evidence, the fact finder's choice between them is not clearly erroneous. *See United States v. Bush*, 79 F.3d 64, 66 (7th Cir.1996) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

The district court at sentencing found more than enough evidence to establish that Xavier and Andre McClinton were the leaders of the conspiracy. The court concluded that Xavier McClinton was an organizer or leader in this conspiracy because of the amount of money to which he had access, the directions that he gave to the other participants, the fact that he resolved disputes that arose among participants in the conspiracy, and the fact that Xavier wire transferred large amounts of money to purchase cocaine. Also, statements from others characterized Xavier McClinton as "running the show."

Xavier McClinton was not, however, the sole leader of the conspiracy. *See* U.S.S.G. § 3B1.1(a), comment. (n.4) (recognizing that more than one person can qualify as a leader or organizer). Both Xavier and Andre McClinton directed the other participants and paid them for their specific tasks. Donald Kelley stated that he picked up cocaine in Chicago and delivered it for both Xavier and Andre McClinton. In fact, the sentencing court believed that Andre McClinton was the brains of the organization more than Xavier McClinton.

Andre McClinton recruited the other participants, including Donald Kelley. He made his own decisions about how the conspiracy would run. He negotiated what the payments would be for different amounts of cocaine. Andre also recruited Abiona Collins and Alacia Reid to import cocaine from Jamaica. He provided not only plane tickets but also legal assistance and bond money to them in Miami. The sentencing court concluded that he exercised decision-making authority over everyone except possibly Xavier McClinton.

Against the weight of this evidence, the McClintons argue that the district court erred by using the wrong methodology in evaluating the § 3B1.1(a) enhancement. As they interpret the case law, courts have used the very factors which the court relied upon as mandating an organizer's role to describe a manager's role. Thus, they argue that the court erred by viewing whether the facts were characteristic of organizing, without considering whether those facts were equally characteristic of managing.

We do not agree with this interpretation of the district court's analysis. In distinguishing between a manager and an organizer, the district court expressly noted that an organizer does not receive instructions from others while a manager does. No one outranked Andre and Xavier McClinton in this conspiracy. They were partners. Together, they handled the daily operations of distribution as well as oversaw disputes between the

other participants. This evidence was enough to establish that the McClintons were more than just managers. *See United States v. Carson,* 9 F.3d 576, 585 (7th Cir.1993) (recognizing that to be an organizer " 'the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purposes of carrying out the crime' ") (quoting *United States v. Fuller,* 897 F.2d 1217, 1220 (1st Cir.1990)).

■ The McClintons also challenge the application of this enhancement to them and not to Ian Haughton, the purported source of cocaine. They believe that the court's application is absurd because the supplier received a lower sentence than the person supplied. Any argument of this type must fail. We will not disturb a sentence because another defendant was treated differently, *see United States v. Colello,* 16 F.3d 193 (7th Cir.1994), if the court sentenced the objectors here in accordance with the guidelines. *See United States v. Sadiq,* 116 F.3d 213, 216 (7th Cir.1997). The court did so here.

Because we agree with the district court that the Government presented more than enough evidence to satisfy the § 3B1.1(a) enhancement, the district court's imposition of this enhancement was not clearly erroneous. *See United States v. House,* 110 F.3d 1281, 1284 (7th Cir.), *cert. denied sub nom. Hughes v. United States,* — U.S. —, 118 S.Ct. 199, 139 L.Ed.2d 136 (1997).

### E. Calculation of Drug Quantities Attributable to Xavier McClinton

Xavier McClinton also challenges the quantity of drugs attributable to him. He claims he is not responsible for between 3.5 and 5 kilograms of cocaine because the statements of Donald Kelley were inherently unreliable. He requests that this Court vacate his sentence.

■ A defendant has the right to be sentenced on the basis of reliable information. *See United States v. Lanterman,* 76 F.3d 158, 160 (7th Cir.1996). The facts on which the court bases a sentence must have "sufficient indicia of reliability to support [its] probable accuracy." *United States v.*

*Salinas,* 62 F.3d 855, 859 (7th Cir.1995). A district court's calculation of the quantity of drugs involved in an offense is a finding of fact to be reversed only for clear error. *See United States v. Acosta,* 85 F.3d 275, 279 (7th Cir.1996); *Salinas,* 62 F.3d at 859. We must affirm unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Beler,* 20 F.3d 1428, 1431 (7th Cir.1994).

■ Kelley confessed to law enforcement officials on two occasions, October 14, 1995 and December 5, 1995. At both times, he provided detailed information about the structure of the McClinton drug conspiracy and the amount of cocaine involved. Kelley stated that he retrieved cocaine for Xavier McClinton two to three times each month for a year. The amounts of cocaine varied from 1/8 kilogram to 1 kilogram. Under a conservative calculation, 1/8 kilogram twice a month for twelve months totals 3 kilograms. At trial, Damon Henderson, Abiona Collins, and Alacia Reid corroborated Kelley's story.

The sentencing court found Kelley's statements when he was first arrested and when he was cooperating with the Government to be credible. The court accepted this testimony, noting that Henderson's testimony supported it. The court also recognized that evidence of wire transfers between the conspiracy members corroborated Kelley's statements. It did not accept McClinton's argument that Kelley's drinking clouded his memory or prevented him from remembering what had happened.

Xavier McClinton's arguments on Kelley's unreliability are based on the fact that Kelley is an admitted drug addict. He believes that the district court should have scrutinized Kelley's reliability with additional care. *See Beler,* 20 F.3d at 1435. However, McClinton highlights nothing that would indicate that the district court did not assess this witness's reliability adequately nor does he point to any evidence questioning the district court's assessment of the reliability of the witnesses who gave corroborating testimony. *See United States v. Hall,* 109 F.3d 1227, 1233 (7th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 153, 139 L.Ed.2d 99 (1997).

We are satisfied that the district court adequately assessed the reliability of this evidence. "It is well established that a sentencing court's credibility determinations are accorded exceptional deference." *Acosta,* 85 F.3d at 280. The sentencing court believed Kelley's statements when he was cooperating with law enforcement. These corroborated statements provided a reliable basis to attribute a drug quantity. Also, the court's reliance on estimates of the drug quantities was not improper. *See United States v. Duarte,* 950 F.2d 1255, 1265 (7th Cir.1991) (reasoning that factual determinations under the Guidelines need not emulate the precision of physics if the court avoids "nebulous eyeballing"). We therefore find the court's determination of Xavier McClinton's offense level was not clearly erroneous.

### F. Possession of a Firearm in Connection with a Conspiracy to Distribute Cocaine

 Finally, McClinton challenges the enhancement of his offense level by two for the possession of a firearm in connection with this drug conspiracy. He claims there is an insufficient nexus between the weapon and the offense.

Section 2D1.1(b)(1) of the Sentencing Guidelines provides a two level enhancement of a defendant's offense level if the defendant possessed a firearm during the commission of a drug crime. This enhancement is warranted even if the crime is one of a drug conspiracy. *See Hall,* 109 F.3d at 1235; *United States v. Wetwattana,* 94 F.3d 280, 283 (7th Cir.1996); *United States v. Cantero,* 995 F.2d 1407, 1410 (7th Cir.1993). The Guidelines require a district court to apply this adjustment if a weapon was present, unless it is clearly improbable that the weapon was connected with the offense. *See U.S.S.G.* § 2D1.1(b)(1), comment. (n.3). The district court's determination that the defendant possessed a firearm in connection with an offense is a finding of fact underlying the enhancement. As a factual finding, we review this determination for clear error. *See United States v. Adams,* 125 F.3d 586, 596 (7th Cir.1997); *United States v. Turner,* 93

F.3d 276, 288 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996).

McClinton argues that the court should consider a Tec–9 assault rifle in the same manner in which an application note treats an unloaded hunting rifle.[1] *See* U.S.S.G. § 2D1.1 (b)(1), comment. (n.3) (stating that a court would not apply the enhancement if the defendant had "an unloaded hunting rifle in the closet" at the time of his arrest). During the execution of a search warrant of Xavier McClinton's residence, law enforcement officers found this weapon and a loaded ammunition magazine in close proximity to a bank bag containing $15,550. At trial, testimony was presented that Xavier McClinton's method of operation was to transport and store the proceeds of his drug trafficking in bank bags. The sentencing court found the proximity of a Tec–9 assault rifle to the money was sufficient to show that it was not "clearly improbable" that the gun was used in connection with drug offenses. *See Cantero,* 995 F.2d at 1412 ("[O]ur review is not limited to the evidence dealing with the proximity of the gun and the drugs at the specific time of the arrest[;] rather, we must determine whether the gun was possessed during the offense, i.e., during the course of the conspiracy.").

The district court did not commit a clear error in applying § 2D1.1(b). Given the testimony presented at trial about Xavier McClinton's method of transporting and storing drug proceeds, it is reasonable to infer that McClinton chose to use his semi-automatic assault weapon to aid him in protecting the proceeds of his drug trafficking. McClinton provided no evidence to suggest that the gun was not connected. The proximity of this weapon to drug proceeds provided the district court with a sufficient nexus to conclude it was not clearly improbable that the gun was connected with the offense. *See United States v. Valencia,* 913 F.2d 378, 385 (7th Cir.1990). We therefore find no clear error.

---

1. This Court admits it has no idea what type of animal would require a hunter to use a Tec–9 semiautomatic assault rifle. Our ignorance on this point, however, does not impact our analysis.

For all the above reasons, we AFFIRM the convictions and sentences of Xavier McClinton, Donald Kelley, and Andre McClinton.