## LEO BRESKE v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY.[1]

August 11, 1911.

Nos. 17,153—(210).

**Federal safety appliance act — movement of car.**

Federal Safety Appliance Act of March 2, 1893, as amended by Act of March 2, 1903, applies to a defective car or engine used in moving a box car from one switch track to another in defendant's yards, when the purpose of moving such car is to load it with merchandise for shipment into another state.

**Evidence — question for jury.**

Evidence considered, and *held* to present a question for the jury as to whether it was defendant's intention at the time such car was moved to ship the merchandise, when loaded, into another state.

Action in the district court for Ramsey county to recover $35,000 for personal injuries. The substance of the complaint and answer is stated in the second paragraph of the opinion. The reply was a general denial. The case was tried before Kelly, J., who, at the close of the evidence, directed a verdict in favor of defendant. From an order denying plaintiff's motion for a new trial, he appealed. Reversed and new trial granted.

*Barton & Kay,* for appellant.

[1] Reported in 132 N. W. 337.

*W. H. Bremner, Eugene Bryan* and *George W. Seevers,* for respondent.

BUNN, J.

Plaintiff, on July 10, 1910, was in the employ of defendant as an engine hostler in and about its roundhouse and yards at Watertown, South Dakota. He was directed by his superior to do certain switching work in the movement of certain cars on tracks in the defendant's yard. The object of this switching was to place on the roundhouse track a box car known as "M. & St. L. 9,641" for loading with scrap iron. This car was standing with a number of other cars on a track known as "No. 1," and was the tenth car on that track, counting from the end from which the engine operated. It was necessary to pull the ten cars from track No. 1 out on the main line, then back them on the roundhouse track, leave the box car there and put the other cars back on track No. 1. In doing the work it was discovered that the coupling apparatus on the car next to the box car was broken, and it was necessary to chain it to the box car. This defective car was the ninth car from the engine, and was known as "C. & A. 24,217." After the cars had been pulled out on the main line and were about to be backed on the roundhouse track, plaintiff attempted to uncouple the box car from the defective car by releasing the chain, and was injured while so doing by the sudden movement of the cars, claimed to have been caused by the act of the engineer in starting without a signal.

Plaintiff brought this action in the district court for Ramsey county to recover damages for the injuries so received. The complaint charged as the negligence of defendant the use of a car with a defective coupler. It alleged that the engine and cars were being used in interstate commerce, and that it was the duty of defendant to have them equipped with automatic couplers. The answer alleged that the accident was caused by the negligence of a fellow servant of plaintiff. At the close of the evidence the trial court directed a verdict for defendant, on the ground that the car having a defective coupler was not being used in interstate commerce at the time of the accident, and that therefore the Federal safety

appliance act and employer's liability act had no application. The court held, further, that the allegations of the complaint were insufficient to show liability at common law. Plaintiff appealed from an order denying his motion for a new trial.

1. The trial court was clearly right in holding that plaintiff's case depended wholly upon the Federal statute. The complaint cannot be construed as containing sufficient allegations of negligence in using defective cars, irrespective of the statute.

2. Do the acts of Congress in question apply to this case? These acts are the safety appliance act of 1893, as amended in 1903, and the employer's liability law (Act April 22, 1908, 35 St. 65, c. 149, [U. S. Comp. St. Supp. 1909, p. 1171]). If they apply to this case, the trial court was in error in directing a verdict; if they do not apply, the action of the court was correct, as it is clear that the accident was caused by the negligence of a fellow servant of plaintiff, for which defendant is not liable, in the absence of a statute changing the common-law rule.

The safety appliance act provides in substance that it shall be unlawful for any common carrier engaged in interstate commerce to haul or permit to be hauled or used on its lines any car used in moving interstate traffic not equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the cars. The employer's liability law removes the defenses of assumption of risk and fellow servant, when a servant is injured by reason of a violation by the carrier of the safety appliance act.

Admittedly defendant was a common carrier engaged in interstate commerce. The only question is whether the car which had the defective coupler was being used in moving interstate traffic. The facts in relation to this car and the other cars, so far as material, are as follows: C. & A. car No. 24,217, the car which had the defective coupler, came from Gary, Indiana, to Watertown, loaded with rails consigned to defendant. It reached Watertown July 8, 1910, and was unloaded either the day before or on the day of the accident. On August 2 it went to Minneapolis as an empty car. M. & St. L. car No. 9,641, the car that was being switched onto the round-

house track for loading, came from Morton, Minnesota, loaded with freight to Watertown, South Dakota, on April 20, 1910. It was unloaded and remained in the yards until August 2, 1910, when it was moved to Minneapolis, loaded with scrap iron. It was put to no use in the state of South Dakota, from the time of its arrival there until its departure, except the partial loading it with scrap iron before the day of the accident, its removal to the roundhouse track for the purpose of further loading, the subsequent completion of its load, and the movement out of the state on August 2. Three of the other eight cars, which, with the two above described, made up the string that was standing on track No. 1 before they were moved to switch the tenth car on the roundhouse track, had come to Watertown from Minnesota on July 7 or 8, loaded with rails. One of these cars was still loaded at the time of the accident; the others had been unloaded; all three moved to Morton, Minnesota, on July 12 empty.

The decisive question is whether the defective car was being *"used in moving interstate commerce"* at the time of the accident, within the meaning of the italicized words as used in the safety appliance act. Congress did not intend the act to apply to defective cars which, though standing on the tracks of railroads engaged in interstate commerce, were not being used in such commerce. When a car used to carry an interstate shipment reaches its destination and is unloaded, it ordinarily thereupon ceases to be "used" in moving interstate commerce. Where, however, after an interstate carriage, the car is to return empty to the state from which it came, it is considered as within the act throughout its trip, including the time between its unloading and the beginning of the return trip. But if, after discharging its interstate cargo, the car is used in intrastate traffic, or if it remains idle in the yards or shops, awaiting repairs, or awaiting a future use for state or interstate business as may afterwards be determined, it is not, while so idle, "used in moving interstate commerce." It is also the law that, though the defective car is not itself being used in interstate business, yet if it is being hauled in a train which contains cars that are being used in moving interstate commerce, the safety appliance act applies.

We think that the above-stated legal propositions are established by the cases decided under this act by the Federal courts. The defective car in this case had been unloaded and was standing on a switch track with other cars at the time it was moved. This was a track used for storing cars loaded with company material and such cars that had been unloaded, and was sometimes used for storing bad-order cars. It does not appear that the defective car was there simply awaiting the opportunity to return to the state from which it came. Presumably defendant would not subject itself to the liability it would incur by starting it on an interstate journey in its bad-order condition. Nor does the evidence indicate that a foreign car from which an interstate shipment is unloaded is usually returned to the company that owns it before it is used for other shipments, perhaps wholly within the state. Nor was the defective car part of a train. It and the nine other cars were lying idle on the storage track, and no train was made up, being made up, or contemplated. The character of the other cars on the track is therefore immaterial. We are not prepared to hold that the defective car was being "used to move interstate commerce," and therefore within the act, while it was lying idle on the switch track.

The question, as it seems to us, is this: What was the object of the movement of the box car from track No. 1 to the round-house track? If the object of this movement was to place it in a position to receive a load to be carried out of the state, the engine and each car in the string, including the defective car, were used in moving interstate commerce from the moment the switching movement began. The situation is the same as if the defective coupler had been on the engine and the box car had been coupled directly to the engine. It would be immaterial whether the engine or car had before that time been engaged in hauling interstate commerce. If the object of the movement was to load the car with goods to be carried out of the state, both the engine and the car would be within the act from the time the movement began. There is an important distinction between merchandise which may be the subject of interstate commerce and the car in which such merchandise is moved. The merchandise is not an article of interstate commerce before

transportation begins, but the car or engine is within the safety appliance act if used as an instrument in moving interstate commerce, and such use begins when it is moved for the purpose of receiving merchandise to be shipped out of the state.

The remaining question is: Was there sufficient evidence to warrant submitting to the jury the question whether it was defendant's purpose or intention, when it ordered the car moved, to send the car to Minneapolis with its load of scrap iron when the loading was finished? The only evidence of defendant's purpose or intention is this: The car was already partly loaded with scrap iron, and was moved on the occasion in question to place it in position for further loading. The loading was completed some ten days after the accident, and the car remained on the track until August 2, when it was moved to Minneapolis. Defendant offered no testimony to show that it was not its intention, when it ordered the car moved, to ship the scrap iron out of the state. In view of this failure to attempt to prove that it had no such intention, a fact which was much easier for defendant to prove than for plaintiff to show the contrary, we think the evidence of the subsequent shipment to Minneapolis of the scrap iron loaded in this car was sufficient to make the question one for the jury. If it was not defendant's purpose to ship the scrap iron, why was it loaded in cars? If it was not its intention to ship to Minneapolis, where did it intend to ship it, and why was the plan changed? Scrap iron in carload lots is too valuable to throw away. It is a fair inference, in the absence of evidence, that it was necessary, in order to obtain its value, to get it to the markets or mills in one of the larger cities east.

We have carefully considered this case, have examined all of the decided cases that are in any way applicable to the facts here, and reach the conclusion that the trial court erred in directing a verdict.

Order reversed, and new trial granted.