**NEW YORK, C. & ST. L. R. CO. v. SLATER.**

Circuit Court of Appeals. Seventh Circuit.
January 13, 1928.

Rehearing Denied February 28, 1928.
No. 3842.

1. **Negligence** ⊂⇒136(9)—**Question of negligence is for court only where all reasonable men must draw same conclusion from facts.**

Question of negligence is one of law for court only, where facts are such that all reasonable men must draw same conclusion from them.

2. **Appeal and error** ⊂⇒927(7)—**Appellate court must view testimony most favorably to party against whom motion to direct verdict is directed.**

Appellate court must dispose of motion to direct verdict on that view of testimony most favorable to party against whom motion is directed.

3. **Master and servant** ⊂⇒286(27)—**Whether railroad's crane operator was negligent in lifting timber without determining whether deceased foreman reached safe place held for jury.**

In action for death of railroad employee, who was struck by timber being loaded on gondola car, question whether railroad's crane operator was negligent in lifting timber to be loaded without taking greater precaution to learn whether deceased employee, a foreman, was in place of safety, *held* for jury.

4. **Master and servant** ⊂⇒288(3)—**Whether foreman assumed risk of injury from timber being loaded on car by crane held for jury.**

In action for death of railroad employee, who was struck by timber which was being loaded on gondola car by crane, whether deceased employee, who was foreman, assumed risk of injury, *held* for jury.

5. **Commerce** ⊂⇒27(5)—**Railroad employee, loading freight intended for shipment from Ohio to Indiana, and actually shipped there, was "engaged in interstate commerce," though no bill of lading was issued at that time.**

Where railroad's superintendent of bridges and building intended that stringers which deceased employee was loading when injured should be shipped from Ohio to Indiana, and shipment was later actually made from Ohio to Indiana, employee was "engaged in interstate commerce," and fact that no written bill of lading or waybill had been issued at time of accident was immaterial, since superintendent could not be bound by action or nonaction of those whose duty it was to see that waybills or bills of lading were issued, or orders actually given.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

Page, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Indiana, Fort Wayne Division.

Action by Alone Slater, administratrix of the estate of Milton R. Slater, deceased,

23 F.(2d)—49½

against the New York, Chicago & St. Louis Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Howard L. Townsend and Albert E. Thomas, both of Fort Wayne, Ind., for plaintiff in error.

Edward B. Henslee, of Fort Wayne, Ind., for defendant in error.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Plaintiff brought this action to recover damages arising from the death of her husband occasioned by the alleged negligence of defendant. Judgment followed a verdict in plaintiff's favor.

Defendant (the parties are described as in the District Court) seeks a reversal of the judgment because of the failure of the court to grant its motion to direct a verdict. It offers two grounds as the basis of its motion: First, the evidence fails to show actionable negligence on its part; second, the evidence shows conclusively that the deceased was employed in intrastate rather than interstate commerce.

[1] The test by which we are to determine whether the evidence presented a jury question has been stated in a multitude of decisions. It is forcibly expressed in Gardner v. Michigan Central Railroad Co., 150 U. S. 349, 14 S. Ct. 140, 37 L. Ed. 1107.

"The question of negligence is one of law for the court only where the facts are such that all reasonable men must draw the same conclusion from them, or, in other words, a case should not be withdrawn from the jury unless the conclusion follows as matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish."

[2] In other words, the appellate court must dispose of this motion upon that view of the testimony most favorable to the party against whom the motion is directed. The occasion for a restatement of a rule so well established is the defendant's statement of facts. It has stated and discussed the facts as though we would first weigh the conflicting testimony and thereafter make our conclusion respecting its negligence.

Deceased and the other employees were engaged in removing certain stringers and loading them on a gondola car. These stringers had been used to sustain a temporary track, and their use was at an end. They were large and heavy—30 feet long, 18 inches wide, and 9 inches thick. The removal op-

eration consisted of fastening hooks to the stringers—the hooks being connected with a cable which was attached to the arm of the derrick. The hook was something like an iceman's tongs. After the hook was fastened, the crane operator applied his power, and the stringer was lifted from the ground and swung into a position, propelled by the force of gravity. Five timbers had been lifted when the operation began on the one the removal of which resulted in Slater's death. Its location called for more caution. As the timber lifted, it started to swing slowly, but its momentum increased. The timber swung violently against the car, and Slater, who was in its path, was struck and killed.

From a reading of the testimony, it is apparent at once that various inferences may be legitimately drawn from certain facts tolerably well established. The persuasiveness of this testimony, and the inferences, too, would depend, we think, upon the individual weighing them. In other words, different men might, and probably would, accord a different degree of persuasiveness to them. A somewhat detailed statement of the removal of this sixth timber is necessary to an understanding of the narrow question involved.

The first four timbers were immediately north of the gondola car, and they were lifted by the crane 6 or 8 feet, and then carried south to a point over the car, and then lowered into it. The fifth and sixth timbers were immediately east of the first four, and of course east and north of the gondola car. The fifth timber was dragged to a position immediately north of the gondola car—into the same place as were the first four timbers. From this position it was placed on the gondola car by an operation similar to that followed in loading the first four timbers.

The sixth timber was handled differently. The hooks were attached at a point about 10 feet from the east end. This place of attachment was considerably east and a short distance north of the gondola car. Lifting the east end of this 30-foot timber was, to the knowledge of Moyer, as he admits, certain to result in its swinging in a partial circle south. As it broke away from the dirt in which it was embedded, it was certain also to gain momentum. Proof of this statement appears in the evidence showing the great force with which this timber struck the car. Moyer knew what would happen, as is shown by his testimony. He said that he told the deceased: "Certainly it will tear itself loose. Yes; when it swings, it is bound to swing south across the other timbers."

Defendant's negligence, if any there be, must arise out of the conduct of Moyer in lifting the timber before Slater reached a place of safety. As bearing upon this particular issue, we quote from the testimony of four witnesses.

Mr. Geist, one of the crew, stated: "After we arrived there that morning, the first thing that was done, Slater gave us our places to work. He told me to give the signals for lifting the timbers. * * * Trier and I hooked the clamps onto this timber. After the hooks were hooked, I gave Moyer a signal that it was already hooked and ready to lift. That was a signal to lift up or take the slack out of the cable. Mr. Moyer took care of the rest, after that signal was given. * * * I did not give him a signal to raise it. The first signal was all I gave him. * * * The only signal I gave was that the hook was hooked and ready to raise. When the hooks were fastened, I walked out to the north side out of the way, out on the fill. * * * At the time I left there, the stringer was still in the ground and the cable was stationary. Trier started away about the same time I started, and Slater started about the same time, I think."

Freels, another one of the crew, testified: "Carper was sitting with me on the west end of the gondola car. After Moyer got back in the crane, and from then on until the time the jar came, I did not hear Moyer, or Geist, or anybody else, sound any warning. * * * I was not doing anything but watching that timber. The first thing I heard after the timber swung around, Geist hollered to Moyer that Slater was hurt. He came from the east end of the gondola car. I looked down and heard him say, 'Pop is hurt.' He was down at the side of the car that we were in."

Carper, another member of the crew, testified: "I felt the car jerk when the timber hit, I heard Trier holler, and looked down on the side of the car, and saw him step around the corner of the car, and then step back. When he stepped back, Slater fell into his arms. I did not know where he was, until I heard him holler; then I saw him. He got back out of the road, I presume, and he hollered, and I looked and saw him, and I saw Slater fall into his arms. At that time the timber was standing up on an angle against the end of the car. The east end of the timber was about 12 feet above the ground, and I think it was resting against the car at about its center point, and the hooks were fastened to it near the east end. Before that timber was raised, I did not see

Mr. Geist give any signal or yell any warning."

Moyer, the crane operator, testified: "I applied the power and raised the stringer up when I got a signal from Geist. When Geist gave me the signal, he was right by the timber; and when he was right by the timber, holding the hooks, he gave me the pick up signal. When he gave me that signal, I tightened up. The signal is a pick-up signal, or tighten-up signal. He did not give me any other signal. I handled the timber after that without signal. * * * Before I lifted the timber, I saw every one walk out of the way as far as I could see. Mr. Trier and Mr. Slater walked south to the end of the car, and the other two men walked to the north, out of the way. I did not pick up the timber during all of that time. I could not see how far Slater walked, because he walked past the end of the car. *I did not know, when I picked the timber up, whether Slater was in a safe position or not. I knew he was out of view, past the end of the car.*"

[3] Upon this evidence, we think a jury might have found that Moyer was not exercising ordinary care when he lifted this timber, without taking greater precaution to learn whether those he could not see were in a place of safety.

[4] We likewise hold that the evidence did not conclusively establish the defense of assumption of risk. Chicago, Rock Island & Pacific Railway Co. et al. v. Ward, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430.

Defendant's other contention is based upon facts which, so it urges, show the intrastate rather than the interstate character of the transaction. Defendant states its position thus: "The fill in which these timbers were used was a part of a 'cut-off,' about a mile and a quarter in length, which was being constructed to shorten a curve in the railroad. This cut-off had not been completed, and had not been used in interstate commerce, and was not being so used; all interstate traffic going over the old road. These timbers were tools that were used again and again for like purposes, and when not in use were kept in the railroad company's warehouse at Conneaut, Ohio, or Ft. Wayne, Ind. At the time the timbers were being taken up, no shipping instructions had been given, and none were given until the day after the accident. Mr. Singer testified that he intended to bring the timbers to the Ft. Wayne storehouse, and that he did order them shipped there the next day after the accident, but found that Mr. Harvey, the chief engineer, his superior, had a different intention

about it and ordered them to Conneaut, Ohio. At the time the timbers were being loaded, they had not been billed for any place."

We find all the evidence bearing upon the character of the shipment in the testimony of one Singer, who stated that he was the superintendent of bridges and building, and had supervision of the new bridge work when Slater met his death. He testified: "The railroad put in the trestle work for the purpose of making the fill. * * * I think the fill west of the bridge * * * was approximately 1,000 feet, and * * * east of the bridge * * * a mile. The trestle work altogether around the bridge was approximately 130 feet. I could not give you the exact number of stringers that were used. I would say that there were approximately 25 used in there; they were laid in tiers of two. * * * I had charge of putting these stringers down. * * * These stringers were brought from Ft. Wayne. We had them in store, and I had charge of these stringers. We are liable to use them most any time. * * * I was notified that the fill was completed and the trestle should be removed. The chief engineer or his assistant gave me this notice. * * * They did not tell me where to take them. *My intention was possibly to take them to Ft. Wayne. I think my intention was to take them to Ft. Wayne, but I knew that we might need them some place else before they came into Ft. Wayne, but I did not have any other place to take them in mind at that time. * * * So far as my intention was concerned, it was to bring them to Ft. Wayne. * * * These timbers did come to Ft. Wayne; that car arrived here, with the timbers in it, * * * in less than a week.*"

[5] From this statement, it is clear that Slater was loading freight to be hauled from Ohio to Indiana when the accident occurred. Two factors determinative of the character of the shipment were here shown: (a) The intention of Singer; (b) the actual shipment of freight from Ohio to Indiana. The fact that no written bill of lading or waybill had been issued was quite immaterial. An employee such as Slater was could not be bound by the action or nonaction of those whose duty it is to see that waybills or bills of lading are issued or orders actually given. Had no waybill or bill of lading ever been issued, the shipment would still have been commerce and its character would ordinarily be determined by its origin and its destination.

In Railroad Commission v. Texas & P. R. Co., 229 U. S. 336, 341, 33 S. Ct. 837, 840 (57 L. Ed. 1215) the court said: "The prin-

ciple enunciated in the cases was that it is the essential character of the commerce, not the accident of local or through bills of lading, which determines federal or state con- trol over it. * * * The staves and logs were intended by the shippers to be export- ed to foreign countries, and there was no in- terruption of their transportation to their destination, except what was necessary for transshipment at New Orleans."

In Breske v. Minneapolis & St. L. R. Co., 115 Minn. 386, 390, 132 N. W. 337, 339, the court said: "If the object of the movement was to load the car with goods to be carried out of the state, both the engine and the car would be within the act from the time the movement began."

In Baltimore & O. S. W. R. Co. v. Burtch, 263 U. S. 540, 44 S. Ct. 165, 68 L. Ed. 433, the court said: "The unloading of an inter- state shipment by an employé of a railroad company is so closely related to interstate transportation as to be practically a part of it, and brings the employé within the protec- tion of the Federal Employers' Liability Act [45 USCA §§ 51–59; Comp. St. §§ 8657– 8665]."

In the present case, there is not only evi- dence of an intent to transport this freight from one state to another, but there was an actual transportation of it. More than this, there was no possibility of such interstate shipment being converted into an intrastate shipment, unless the avowed intention of the superintendent was changed by a situation arising subsequent to the time of the accident.

Other assignments of error we have duly considered, but do not view them of sufficient importance to merit discussion in this opin- ion.

The judgment is affirmed.

PAGE, Circuit Judge (dissenting). This case was tried upon the theory that decedent was injured as a result of a change, without notice to decedent, in the method of handling the sixth timber from that used in handling the first five. The same evidence which shows there was a change, shows that decedent had full knowledge of the change and that it was made under his direction as foreman.

Plaintiff should recover upon the case al- leged or not at all. The majority opinion is based upon the statement: "Defendant's negligence, if any there be, must arise out of the conduct of Moyer in lifting the timber before Slater reached a place of safety."

With other evidence set out, the majority opinion quotes and underscores the follow- ing from Moyer's testimony: "I did not know, when I picked the timber up, whether Slater was in a safe position or not. I knew he was out of view, past the end of the car."

Following the quotations, the opinion con- cludes: "A jury might have found Moyer was not exercising ordinary care when he lifted the timber, without taking greater pre- caution to learn whether those he could not see were in a place of safety." To have done so, the jury must have ignored the obliga- tion placed by the law upon plaintiff to prove negligence by a preponderance of the evi- dence, and must also have ignored every def- inition of the term "ordinary care."

The evidence is that: Slater, as foreman, directed the change of method in handling the sixth timber, after he was told (and which he must have known without being told) that the timber would swing around to the south; there was no change in the signals; the tim- ber was embedded in the earth to its top; the cable was fastened to the timber about 10 feet from the east end of the timber, 60 or 70 feet away from the "clam car," so that necessarily any pick-up must have taken time and been slow; after the usual signal, the cable slack was taken up by Moyer; every one left the side of the timber, Slater having a shorter distance to go to a place of safety than Trier, and went a shorter distance than Geist, Wilson, or Trier; Slater was not hard of hearing, and had less than 25 feet to go; all the witnesses say that Moyer waited for the men to get away; nothing that was done was unknown to Slater.

If the statement of Moyer, relied on by the majority opinion, amounts to anything on the question of negligence, it conclusively shows that Moyer was not negligent, but that Slater was. The reason Moyer did not know whether Slater was in a place of safety was because, when he picked the timber up, Slater was out of view, past the end of the car, that is, he did not pick the timber up until Slater, going in the direction of safety, was out of sight, past the end of the car. All say the timber at first came up out of the ground very slowly, and, manifestly, embedded as it was, and as far out on the cable as it was, it must have done so, yet Slater, "out of view, past the end of the car," could not have been, when Moyer started the slow lift, more than one step from where he was when hurt. In addition to all this evidence, and as show- ing the extreme care of Moyer, he, before starting the lift, told every one it would swing, and to get out of the way. Defendant was not bound to take more care of Slater than he was bound to take of himself. It was not an insurer. Instead of meeting the bur-

den of proof, plaintiff has failed to present any evidence of negligence on defendant's part. This is not a case where the accident is itself evidence of negligence.

The judgment should be reversed.