**UNITED STATES OF AMERICA,**
**Plaintiff–Appellee,**

v.

**KEVIN C. WARD, Defendant–Appellant.**
**No. 97–1810.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1997.

Decided May 12, 1998.

Judith A. Stewart, Melanie C. Conour (argued), Office of the United States Attorney, Indianapolis, IN, fir Plaintiff–Appellee.

Mark C. Webb, Symmes, Voyles, Zann, Paul & Hogan, Indianapolis, IN, Roger Ro-

sen (argued), Los Angeles, CA, for Defendant–Appellant.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Kevin Ward was arrested at the Greyhound bus terminal in Indianapolis when he attempted to claim a bag made to look like one that he had checked onto a bus in Los Angeles. As he soon discovered, the authorities had taken the real bag off the bus in Springfield, Missouri, subjected it to a canine sniff and, pursuant to a search warrant obtained after the dog "alerted" to the bag, opened it to discover a kilogram of cocaine and a loaded firearm inside. Ward eventually was convicted of attempting to possess cocaine with the intent to distribute. *See* 21 U.S.C. §§ 841(a)(1), 846. Ward contends that the contents of the suitcase should have been suppressed because the authorities lacked grounds to remove the bag from the luggage compartment of the bus in Springfield and submit it to the nose of the narcotics detection dog. We disagree and find no violation of the Fourth Amendment under the circumstances presented. We also find no error in the refusal to grant Ward a reduction in his offense level for being a minor participant in the offense. *See* U.S.S.G. § 3B1.2(b).

## I.

On the morning of August 31, 1992, Ward purchased a bus ticket for travel from Los Angeles to Indianapolis via the Greyhound "LA Express". Ward checked a brown "World Traveler" brand suitcase with a baggage handler and received a claim ticket for the bag. The Greyhound identification tag on the bag bore the name "Eric Ford," a South Central Los Angeles address, and a Los Angeles area code (213) but no local telephone number. The bag was subsequently placed in the luggage compartment of the bus, which is accessible only from the exterior of the vehicle. Ward himself never

boarded the bus, however. Instead, he flew to Indianapolis the following day, September 1, when the bus and bag were scheduled to arrive.

The LA Express left Los Angeles as scheduled on August 31. At approximately 8:35 a.m.[1] the following day, the bus arrived in Springfield, Missouri for a thirty-minute meal stop. This was the last scheduled stop prior to St. Louis, where someone bound for Indianapolis would have had to change buses. Since at least the beginning of 1992, the federal Drug Enforcement Administration in conjunction with local law enforcement personnel had been interdicting buses traveling through Springfield from the west and inspecting passengers and their luggage. Drug couriers apparently frequented the eastbound bus routes passing through Springfield. Thus, DEA Special Agent Carl Hicks and Springfield Detective Mark Deeds were waiting for the LA Express when it arrived on September 1 and commenced an inspection after the bus arrived.

During the stop, Deeds began to question Andre Adams, one of the passengers on the bus. Deeds became suspicious of Adams and requested permission to search Adams' Ricardo of Beverly Hills garment bag. Adams consented. While Deeds was examining the contents of that bag, he noticed a matching bag in the overhead compartment above Adams. Adams denied that the bag was his, however, as did every other passenger on the bus. (The bag identification tag bore the name "Lisa Williams.") Deeds decided to search the second bag, and inside he discovered two kilograms of cocaine. Adams was arrested and taken off the bus into the bus station.

After the cocaine was discovered in the carry-on bag, Special Agent Hicks decided to inspect the luggage in the baggage compartment underneath the passenger cabin to determine whether Adams had checked any other bags onto the bus. Hicks was a twenty-year veteran of the DEA and had been working on common-carrier interdictions for the previous five years. During his inspec-

---

1. The record does not establish exactly when the bus arrived and departed, but the lack of clarity on this point is immaterial. The parties agree, as we note below, that the interdiction efforts we are about to describe did not delay the departure of the bus.

tion of the luggage compartment, Hicks' attention became focused on a World Traveler suitcase. The Greyhound identification tag on the suitcase bore the name "Eric Ford." Hicks said that he became interested in the bag because the tag bore an address located in South Central Los Angeles, which (based on his prior work in Los Angeles) he knew to be a high-crime area of the city. He also noticed that the tag included an area code but not the local telephone number. Hicks knew by this time that Adams had boarded the bus in Los Angeles, and, thinking that the bag might be his, Hicks took the bag out of the luggage compartment and showed it to Adams. Adams said that the bag was not his, however. Hicks subsequently displayed the bag to the other passengers on the bus, but none claimed ownership of the bag. In fact, a tag on the bag indicated that it was checked through to Indianapolis, but when Hicks checked the passenger tickets in the bus driver's possession, he found no ticket for a passenger bound to Indianapolis.

Based on his drug interdiction experience, Hicks knew that it was a common strategy for a drug courier to purchase a bus ticket and check luggage containing drugs with the bus line for transport in the main luggage compartment of the bus. With the luggage in the custody of the bus company, the courier would then travel to his destination by another means. When the bus arrived at that destination, the courier would claim the bag only after he had satisfied himself that the authorities were not showing any interest in him or the bag. If his suspicions were aroused, the courier would simply leave the bus terminal without claiming the luggage. Because the courier himself had not traveled on the bus, the authorities presumably would have a more difficult time connecting the contraband to him. During the eight months that he had been inspecting buses in Spring-

field, Hicks had discovered unattended bags containing drugs approximately twice each week. Hicks was also under the impression that Greyhound had a policy prohibiting a ticketholder from checking a bag onto the bus if he himself was not going to travel on the bus.[2]

Hicks decided to subject the World Traveler bag to inspection by a narcotics detection dog. Until this point, the interdiction of the LA Express had caused no delay in the scheduled departure of the bus. Hicks had no narcotics detection dog at his ready disposal, however, and instead had to telephone a request to the Springfield police department. "Preston" was the only dog available that day, and Preston and his handler did not arrive at the bus station until approximately 10:30 a.m. The bus, meanwhile, had proceeded on its way to St. Louis at 9:00 or 9:15 a.m. without the bag. When the bag was presented to Preston, he "alerted" to it, indicating that it contained narcotics.

Hicks obtained a warrant to search the bag and inside discovered a kilogram of cocaine and a Glock Model 22 semi-automatic handgun loaded with hollow-point ammunition.[3] Hicks then contacted DEA agents in Indianapolis and had them prepare a look-alike bag to present to whomever might claim the suitcase. After several telephone calls to confirm the arrival of the bus in Indianapolis, Ward showed up at the terminal and presented his claim ticket. A DEA agent posing as a baggage handler gave him the dummy bag. Ward took the bag and turned to leave, but quickly realized that something was amiss. He told the agent that the bag was not his, took his claim ticket back, and left the terminal having refused to complete a form for lost luggage. He was caught and arrested.

2. Hicks' belief was based on his prior conversations with numerous Greyhound bus drivers. The terminal manager for the Indianapolis Greyhound station, however, testified that he knew of no written policy requiring that all checked luggage be accompanied by a passenger. The district court noted that even if there were no written policy to this effect, there still might be a de facto policy requiring passengers to travel with their luggage. *United States v. Ward,* 928 F.Supp. 1423, 1431 n. 8 (S.D.Ind.1996). The

court in any event found Hicks' belief that there was such a policy to be reasonable under the circumstances. *Id.* Even if this belief were disregarded, the court observed finally, there was nonetheless a sufficient evidentiary basis to establish a reasonable, articulable suspicion that the World Traveler suitcase contained contraband. *Id.*

3. Ward's prints were later discovered on the ammunition magazine.

Ward subsequently told the DEA that he had flown to Indianapolis with the intent to claim the World Traveler bag and deliver it to "Cal," who was later identified as Kelvin Lampkins. This was the second such trip he had made for Lampkins. Ward agreed to cooperate with the DEA and made a controlled delivery to Lampkins. Immediately thereafter, however, Ward fled the custody of the DEA and remained a fugitive until he was arrested in Los Angeles more than three years later. In his absence, Ward was indicted for conspiring to possess cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Following his capture late in 1995, Ward appeared before the district court and moved to suppress the cocaine and the gun. The district court conducted an evidentiary hearing and denied the motion in a very thorough written opinion. *United States v. Ward*, 928 F.Supp. 1423 (S.D.Ind.1996).

The court concluded initially that the detention of Ward's World Traveler suitcase for inspection by Preston the narcotics detection dog was supported by a " 'reasonable, articulable suspicion, premised on objective facts, that [Ward's bag] contain[ed] contraband or evidence of a crime.' " *Id.* at 1430, quoting *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). The court took note of the following circumstances, which it considered in light of Hicks' more than twenty years on the job with the DEA, his five years of work in drug interdiction, and his experience with interdiction at the Springfield bus stop in particular: (1) Hicks and Deeds had just arrested an individual traveling on the LA Express who had narcotics in his possession; (2) Hicks had discovered a bag in the luggage compartment of the bus that none of the passengers would claim; (3) Hicks believed that Greyhound policy required passengers to travel with their checked baggage; (4) the bag had apparently been shipped from Los Angeles, a recognized source city for narcotics, and from a high-crime area of the city; (5) the identification tag on the bag bore an area code but no telephone number; (6) Hicks had previously discovered narcotics in other "orphan" bags on eastbound buses passing through Springfield. 928 F.Supp. at 1430–31. In the court's view, these facts constitut-

ed "a wholly sufficient basis to support Hicks' reasonable suspicion that the bag in question was likely to contain drugs." *Id.* at 1431.

The court also found the delay in submission of the bag to inspection by the narcotics detection dog to be reasonable. Because Ward had sent the bag on its way unaccompanied, the court reasoned, the detention of the bag pending the canine inspection did not implicate the concerns that the Supreme Court had addressed in *Place*—the detention did not intrude on Ward's possessory interest in the bag, nor did it interfere with the liberty interest that a passenger on the bus typically would have in proceeding on his way. *Id.* at 1431–32 & n. 9. Instead, "Wards's World Traveler bag was more like a piece of freight being transported by a common carrier...." *Id.* at 1432. For guidance in addressing the Fourth Amendment interests implicated by that scenario, the court looked to the First Circuit's opinion in *United States v. LaFrance*, 879 F.2d 1, 7 (1989), which reasoned in part that the detention of a Federal Express package did not begin to interfere with the defendant's possessory interest until the contractual deadline for delivery of the package had come and gone. That rationale suggested to the district court that the detention of Ward's bag pending the canine inspection never cognizably interfered with Ward's possessory interest; that interest was not implicated until the bag was due to arrive in Indianapolis that evening, and by that time, the warrant-authorized search of the bag had supplied the DEA with probable cause to seize the bag. 928 F.Supp. at 1433. Even so, the court went on to consider the factors the First Circuit had drawn from *Place* to assess the reasonableness of the detention (*see LaFrance*, 879 F.2d at 7), and found that the delay occasioned by the wait for the narcotics detection dog was reasonable. The court found Hicks to have acted diligently: the dog and its handler had been summoned expeditiously and arrived in about an hour; and although things might have moved much more quickly had the DEA arranged for a dog to be on stand-by when the bus first arrived, the court rejected the notion that the government was required to make such ar-

rangements. 928 F.Supp. at 1434–35. The court also found the length of the detention to be reasonable. For the sake of argument, the court indulged the assumption that the duration of the detention should be measured not by how long it took for the dog to arrive, but instead by how much later the bag would have arrived in Indianapolis assuming that the dog had not alerted to the bag and Hicks had placed it on the next eastbound bus—a delay of approximately three hours and fifteen minutes. *Id.* at 1435. The court noted that the only alternative Hicks had to removing the bag from the LA Express and awaiting Preston's arrival was to leave the bag on the bus and attempt interdiction at some later point. There were significant problems with that alternative, however: (1) the DEA had no interdiction team in St. Louis, and (2) there was no guarantee that the owner of the bag, if he actually were on the bus notwithstanding Hicks' inability to locate him, might not remove the bag from the luggage compartment and elude authorities when the bus next stopped. Therefore, taking the bag off the bus in Springfield was, in the court's estimation, the only reasonable course of action. *Id.* at 1436.

After the district court denied Wards' motion to suppress, it conducted a bench trial and convicted Ward on the conspiracy charge. Ward subsequently moved for a judgment of acquittal, which the court first denied but then granted on reconsideration. Thereafter, Ward pled guilty to an information charging him with an attempt to possess cocaine with the intent to distribute, but he reserved the right to appeal the adverse ruling on the motion to suppress. The court ordered him to serve a prison term of 265 months, the low end of the guideline range for career offenders (Ward had prior burglary and narcotics convictions). In so doing, the court rejected sub silentio Ward's contention that he qualified for a minor-participant reduction in his offense level.

## II.

▮ Ward contends that Special Agent Hicks seized his bag without reasonable suspicion, in violation of the Fourth Amendment. Our review of the district court's decision to the contrary is plenary. *Ornelas v. United States,* 517 U.S. 690, 698–700, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996); *United States v. Richardson,* 121 F.3d 1051, 1054 (7th Cir. 1997). Of course, we defer to the court's findings of historical fact, granting "due weight to the inferences that resident judges and local law enforcement officers draw from those facts." *United States v. Dennis,* 115 F.3d 524, 532 (7th Cir.1997), citing *Ornelas.* Whether and when Ward's· bag was seized, whether that seizure was supported by the requisite degree of suspicion, and whether the seizure itself was reasonable, are questions that we consider de novo, however. *Ornelas,* 517 U.S. at 698–700, 116 S.Ct. at 1663; *United States v. Tirrell,* 120 F.3d 670, 674 (7th Cir.1997); *United States v. Avery,* 137 F.3d 343, 348 (6th Cir.1997); *United States v. Peterson,* 100 F.3d 7, 11 (2d Cir. 1996); *United States v. Polk,* 97 F.3d 1096, 1098 (8th Cir.1996).

▮ Before we turn to the facts of this case, we shall say a few words about the legal framework against which we shall assess those facts. The Supreme Court has held that "when the police seize luggage from the suspect's custody, ... the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." *Place,* 462 U.S. at 708–09, 103 S.Ct. at 2645. Thus, the detention of a traveler's luggage must be supported by a reasonable belief, based on specific and articulable facts, that it contains contraband. *Id.* at 703, 103 S.Ct. at 2642; *see Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The detention itself must also be reasonable, *Place,* 462 U.S. at 706, 103 S.Ct. at 2644, an assessment that turns on the diligence of the authorities, the length of the detention, and the information conveyed to the suspect, *id.* at 709–10, 103 S.Ct. at 2645–46.

In this case, of course, the detained bag was in transit unaccompanied by its owner. Consequently, the range of interests affected by the detention is narrower than was the case in *Place.* As the Supreme Court explained:

> Particularly in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on

both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.

462 U.S. at 708, 103 S.Ct. at 2645. Given that Ward was not traveling with the World Traveler bag, his liberty interest was unaffected by the decision to detain that bag for a canine sniff. Being both absent and ignorant of what was transpiring, he was not confronted with the dilemma of whether to remain with the bag and delay his own travel or to proceed onward without it. *See LaFrance,* 879 F.2d at 5–6; *United States v. Lovell,* 849 F.2d 910, 916 (5th Cir.1988).

Two interests protected by the Fourth Amendment were nonetheless potentially implicated by the detention of Ward's bag for the dog sniff: his privacy interest in the contents of the bag, *see United States v. Van Leeuwen,* 397 U.S. 249, 253, 90 S.Ct. 1029, 1032 (1970), and his right to possess the bag, *see LaFrance,* 879 F.2d at 5–6. *See also Texas v. Brown,* 460 U.S. 730, 747–48, 103 S.Ct. 1535, 1546, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring in the judgment). The DEA did not intrude upon Ward's privacy interest by opening the bag until after the canine had alerted to the bag, supplying probable cause for the warrant which authorized a search of the bag's contents. As *Place* makes clear, a canine sniff does not expose non-contraband items within a bag to public view; consequently such an inspection does not constitute a search within the meaning of the Fourth Amendment when the bag is in a public place. 462 U.S. at 707, 103 S.Ct. at 2644–45; *see United States v. Jacobsen,* 466 U.S. 109, 123–24, 104 S.Ct. 1652, 1662, 80 L.Ed.2d 85 (1984). Ward himself

concedes that the DEA could have introduced a narcotics detection dog into the luggage compartment of the bus to sniff the bags therein without any degree of suspicion whatsoever. *See United States v. Garcia,* 42 F.3d 604, 606 (10th Cir.1994) (collecting cases), *cert. denied,* 514 U.S. 1073, 115 S.Ct. 1713, 131 L.Ed.2d 573 (1995); *United States v. Harvey,* 961 F.2d 1361, 1363 (8th Cir.) (per curiam), *cert. denied,* 506 U.S. 883, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992). As for the possessory interest, it is again noteworthy that Ward himself was not on the bus with the bag. With the bag checked onto the bus, Ward parted ways with it, intending to pick it up when the bus arrived in Indianapolis. It was as if he had shipped a package with Greyhound (except that the freight charge would have been about half of what Ward paid for the bus ticket). In that instance, the First Circuit has reasoned, the owner's possessory interest is defined by the common carrier's contractual obligation to deliver the bag at a specified time. *LaFrance,* 879 F.2d at 7. In its view, a detention does not begin to interfere with the owner's possessory interest until it delays delivery of the package beyond the contractually agreed-upon hour. *Id.* That view finds support in *Van Leeuwen,* which found that "*no* interest protected by the Fourth Amendment was invaded" by the overnight delay in forwarding packages that the defendant had sent through the mail. 397 U.S. at 253, 90 S.Ct. at 1032 (emphasis supplied).[4]

Ward recognizes that if we examine the detention of his bag through the lens of cases like *Van Leeuwen* and *LaFrance* rather than *Place,* "it is arguable that the scope of the detention of [his] bag would comport with Fourth Amendment requirements." Ward Br. 17. In view of the fact that Ward was not traveling with his bag and his liberty interest was undisturbed by the detention of his bag, *Place* is not the most relevant precedent here. Pragmatically speaking, Ward had no cognizable interest in repossessing his bag until the bus arrived in Indianapolis. By that time, however, the temporary detention of his bag for investigatory purposes had

---

4. *See also, e.g., United States v. Visser,* 40 M.J. 86, 90 (C.M.A.1994) (no possessory interest invaded by seven-day detention of accused's household goods where accused had surrendered goods to moving company for transport during that seven-day period).

**1032**

long since concluded. The dog had alerted to the bag, a magistrate judge had issued a search warrant, and the cocaine and gun had been discovered. At that juncture, the authorities had every right to keep the bag in their possession given the contraband found inside. *See United States v. Lewis*, 902 F.2d 1176, 1180 (5th Cir.1990).

Even so, Ward argues, the decision to detain his bag in the first instance required the type of reasonable suspicion of which the Supreme Court spoke in *Place*. A seizure is still a seizure, he reasons, even if it results in no appreciable delay in delivery of the seized item. We shall turn to that argument in a moment; but first we shall attempt to identify when Ward's bag was "seized" by the authorities. Ward argues that his bag was seized the moment Hicks removed it from the luggage compartment of the bus. That seizure was thus improper, he argues, because at that point in time Hicks lacked a reasonable suspicion based on specific, articulable facts that the bag contained contraband.

■ We agree that when Hicks first examined the World Traveler bag and decided to take it out of the luggage compartment, any suspicions he had as to contraband within the bag were not reasonable in Fourth Amendment terms. The most he knew about the bag at that point was that it originated from a high-crime area of a source city for narcotics, and that whoever had filled out the identification tag had included a Los Angeles area code but not a local telephone number. Hicks attributed much significance to the incomplete telephone number, but we do not. The omission could be consistent with an intent to deceive or evade the authorities- Ward might not have wanted to provide a telephone number that could be checked against the address given on the tag, for example. But it could just as easily be explained by the bag owner's lack of time, distraction, or forgetfulness. Of course, Hicks also knew that Adams had boarded the bus in Los Angeles, and Adams had been discovered carrying cocaine. But the bus was the LA Express, after all, and a significant number of the passengers had boarded in Los Angeles. Hicks had no reason at that moment in time to believe that the bag belonged to Adams. The fact that the bag's identification tag bore an address in a high-crime area of Los Angeles did not otherwise render Hicks' suspicions reasonable. Millions of people live in Los Angeles, thousands in South Central Los Angeles, and most do not deal in narcotics.

■ Although Hicks therefore lacked a reasonable basis to "seize" the bag in the sense that *Place* describes—to remove it from a passenger's possession and detain it briefly so that it might be subjected to a canine sniff—we do not agree that the bag was in fact seized in a way that implicated Ward's Fourth Amendment interests. A "seizure" of property connotes "some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. We are talking now solely about the removal of the bag from the common luggage area of the bus. Ward, as we have noted, agrees that Hicks could have opened the compartment and allowed a dog to enter and sniff the bags. *See Garcia, supra*, 42 F.3d at 606. What Hicks could not do without reasonable suspicion, Ward believes, was handle the bag and take it out of the compartment. That belief is erroneous.

Hicks had surrendered custody of the bag to Greyhound and no doubt realized that the bag would be transported to Indianapolis in the common luggage compartment of the bus. He could reasonably have foreseen that the bag would be handled, moved around, and even taken off the bus, whether at intermediate stops when the driver might need to remove the bag to sort and/or gain access to other luggage, or at a hub like St. Louis where the bag would have been transferred to another bus. He could have no reasonable expectation, in other words, that the bag would not be touched, handled, or even removed from the bus prior to the bag's arrival in Indianapolis. *See California v. Ciraolo*, 476 U.S. 207, 213–14, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210 (1986).

Other courts have recognized that when a law enforcement officer merely handles a bag in the passenger area of the bus, she invades no interest protected by the Fourth Amendment. *See United States v. Gant*, 112 F.3d 239, 241–42 (6th Cir.1997) (unattended bag removed from overhead compartment of bus to seat below to facilitate dog sniff); *United*

*States v. Gault*, 92 F.3d 990, 992 (10th Cir.) (agent kicked, then lifted bag that train passenger had left unattended in front of his seat, protruding slightly into aisle), *cert. denied*, — U.S. —, 117 S.Ct. 321, 136 L.Ed.2d 236 (1996); *United States v. Graham*, 982 F.2d 273, 274 (8th Cir.1992) (luggage removed from overhead rack to facilitate dog sniff); *Harvey, supra*, 961 F.2d at 1363–64 (unattended baggage removed from overhead compartment of bus and placed in aisle for dog sniff); *but see id.* at 1366 (Lay, C.J., dissenting) (arguing that passengers have reasonable expectation that bags they bring with them onto bus and place in overhead compartments will not be displaced or disturbed without their consent).

We need not even go that far here. Having surrendered custody of his bag to Greyhound for transport in the common luggage compartment of the bus, Ward could expect a significantly greater degree of handling by strangers than would a passenger who carried a bag with her onto the bus. Consequently, Hicks did not "seize" Ward's bag merely by touching and then removing it from the luggage compartment. Handling the bag to that limited extent did not impinge on any of the rights that the Fourth Amendment protects. *See United States v. Johnson*, 990 F.2d 1129, 1132–33 (9th Cir. 1993) (no seizure when officers removed checked luggage from tarmac and subjected it to dog sniff before it was placed on plane); *Lovell, supra*, 849 F.2d at 916 (no seizure when, to facilitate examination, bags were lifted off conveyor belt after passenger had checked them with airline); *United States v. Goldstein*, 635 F.2d 356, 361 (5th Cir. Unit B) (no seizure when checked bags removed from airline luggage cart to facilitate dog sniff), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981); *see also United States v. Riley*, 927 F.2d 1045, 1048 n. 4 (8th Cir.1991) (although court concluded that separation and detention of checked suitcase from other baggage for purpose of dog sniff were supported by reasonable suspicion, court suggested that exposing "checked baggage to a trained sniffing dog may be no seizure at all"); *United States v. England*, 971 F.2d

419, 420–21 (9th Cir.1992) (no seizure when mail moved from assigned area for dog sniff). *Cf. Harvey*, 961 F.2d at 1366 (Lay, C.J., dissenting) ("the defendants *declined* to check their personal luggage with a third party, the bus company, preferring instead to place their effects in the more private and accessible compartments above their seats on the bus.") (emphasis in original).

The earliest point at which the bag was seized in the Fourth Amendment sense was when Hicks, after querying Adams and the other passengers about the bag, made the decision to hold it for a canine inspection. Given the imminent departure of the bus and the lack of a narcotics detection dog at the station, that decision interrupted the bag's transport and removed it from the bus on which Ward had placed it. Had the canine not alerted to the bag, Hicks would have been forced to place the bag on a later bus, thus interfering with Ward's contractually-based expectation that he would regain possession of the bag at a particular time. *Contrast, e.g., Johnson*, 990 F.2d at 1132 (process of moving luggage and submitting it to dog sniff was completed before luggage would have been placed on plane); *England*, 971 F.2d at 420 ("[i]t is undisputed that had the sniff test been negative, the package could easily have been returned to the postal station and put on its regularly scheduled flight to Birmingham"); *LaFrance*, 879 F.2d at 7 (police initially instructed Federal Express to keep suspect package on delivery truck while arrangements made for canine sniff, so that there was no "interference with the package's normal course"); *United States v. Puglisi*, 723 F.2d 779, 786 n. 7 (11th Cir.1984) (distinguishing *Goldstein*, where "had the dog not alerted the luggage would have been immediately returned to the baggage cart with no delay, injury, or impairment"). The record indicates that if Ward's bag had been placed on the next eastbound bus passing through Springfield, it would have arrived in Indianapolis approximately three hours and fifteen minutes later than it would have had the bag never been detained; so there would have been a delay of at least that much time in returning the bag to Ward's possession.[5]

---

**5.** There may have been other means by which the bag could have been forwarded to Indianapolis that would have eliminated the delay, as the

district court pointed out. Tr. May 16, 1996 at 79. The Springfield, Missouri metropolitan area

Of course, the sniff and the search of the bag in fact produced the gun and the cocaine, giving Hicks the authority to hold the bag past its scheduled arrival in Indianapolis. *See Lewis,* 902 F.2d at 1180. But his initial decision to detain the bag for the canine sniff risked a delay for which the Fourth Amendment would require justification.

■■■■ Assuming that Hicks could not have detained the bag for the sniff without reasonable suspicion that the bag contained contraband, we conclude that he had such suspicion when he made the decision to do so.

"Reasonable suspicion" is "more than an inchoate and unparticularized suspicion or hunch." [*United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) ] (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883) (internal quotations omitted). It is a concept that "is not 'readily, or even usefully, reduced to a neat set of legal rules.' " *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)). In determining whether a reasonable suspicion existed, we must consider the "totality of the circumstances." *Id.* at 8, 109 S.Ct. at 1585; *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir.1995). In the end, the analytical process requires a practical determination; it "does not deal with hard certainties, but with probabilities." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)....

*United States v. Jerez,* 108 F.3d 684, 693 (7th Cir.1997); *see also Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) ("Reasonableness ... is measured in objective terms by examining the totality of the circumstances."). If we are satisfied that the facts confronting Hicks would give rise to a reasonable suspicion that Ward's suitcase contained contraband—a question that calls for the exercise of common sense—then Hicks' decision to detain the bag for further investigation did not violate Ward's Fourth

Amendment rights. *See Jerez,* 108 F.3d at 693.

As background facts, Hicks knew that the bus route through Springfield was a popular route for transporting drugs from source cities like Los Angeles (whence the World Traveler bag had originated) to destination cities further east. He also knew that sending bags unaccompanied on the bus was a typical strategy employed by drug couriers. Indeed, during the eight months that Hicks had been interdicting buses in Springfield, he had intercepted such bags on a twice weekly basis and, with one exception that he could recall, nearly always discovered drugs within them.

More specifically, on the date that Hicks intercepted Ward's World Traveler bag, cocaine had already been discovered in a carry-on bag that the agents had attributed to Andre Adams. The World Traveler bag, of course, did not match the Ricardo of Beverly Hills bags that were on the bus with Adams, and the identification tag did not bear his name. Adams also disclaimed the World Traveler bag when asked about it. Hicks might still have reasonably thought that the bag belonged to Adams: after all, not all passengers travel with matched sets of luggage, the Ricardo of Beverly Hills carry-on bag with the cocaine did not bear his name either, and Adams had disclaimed that bag as well (notwithstanding that it was in the luggage compartment over his head, along with the matching bag that he did claim as his). In any case, Hicks questioned each of the other passengers, and none claimed the bag. Moreover, when he checked with the bus driver, he found no tickets for passengers traveling to Indianapolis.

Based on these specific, articulable facts, we believe that Hicks had reasonable suspicion to detain the bag for examination by a canine detection dog.

has a population of 250,000 persons and is served by a commercial airport. Theoretically, the DEA could have had the bag flown to Indianapolis, for example, if the sniff and/or the subsequent search of the bag had yielded no contraband. Whether the use of alternate means to get the bag to Indianapolis on time would have eliminated any possible interference with Ward's

Fourth Amendment interests is not a question that we need consider. There is no evidence in this record that the DEA could or would have employed whatever speedier means of transportation that may have been available. We shall therefore assume that Hicks would have simply placed the bag on the next bus heading east.

■ Again assuming that the detention preceding the positive canine sniff and the search of the bag was a detention recognized by the Fourth Amendment, we also consider whether the scope of the detention was reasonable—that is, whether the authorities demonstrated diligence in carrying out the investigative purpose of the detention and whether the length of the detention was acceptable. *See Place,* 462 U.S. at 709–10, 103 S.Ct. at 2645–46.[6] Agent Hicks demonstrated due diligence in detaining the bag. He resolved to submit it to a canine sniff only after the passengers on the bus refused to claim it and he had reasonable suspicion to believe that it contained contraband. He quickly telephoned for a canine, which arrived little more than an hour later. The fact that Hicks did not have a dog at ready does not exemplify a lack of diligence. Hick's testimony indicates that a dog typically was present when the first of two eastbound buses passed through Springfield each weekday morning, but that on occasion the dog and its handler were unavailable to meet the later bus, as was true here. His testimony also suggests that there was no predictability as to when an unattended bag like Ward's might turn up, but that on average, the detention of such bags for canine inspection was required no more than twice a week. Demanding that he have a dog on or near the premises for *every* bus interdicted strikes us as unreasonable. *See United States v. Borys,* 766 F.2d 304, 314 (7th Cir.1985) (noting that DEA was not required to have drug detection dog immediately available, but only readily available), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *United States v. Cooper,* 873 F.2d 269, 275–76 (11th Cir.) (collecting cases), *cert. denied,* 493 U.S. 837, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989). As for the length of the detention, again assuming that three hours and fifteen minutes is the relevant time period to consider (rather than the approximately ninety minutes between removal of the bag from the bus and the positive canine sniff, for example), we do not find it to be excessive. Although the Supreme Court found a ninety-minute delay too long in *Place,* that was, as we have emphasized, a case in which the bag was seized from the possession of a passenger; and the Court noted that a much more lengthy detention had been sustained where, as here, the detained object was in transit apart from its owner. 462 U.S. at 705 & n. 6, 103 S.Ct. at 2643 & n. 6 (citing *Van Leeuwen*). Ward had chosen to ship the suitcase by bus, which is a relatively slow means of transport, and a delay of three hours and fifteen minutes, in the context of a two-day bus trip, is not unreasonable.

### III.

■ Finally, Ward contends that on the facts of the case, he was entitled to a two-level reduction in his offense level for being a minor participant in the offense. U.S.S.G. § 3B1.2(b). A "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal," *id.* comment. (n.3), with a "minimal participant" being one "plainly among the least culpable of those involved in the conduct of a group," *id.* comment. (n.1). The mere fact that the defendant played a lesser role in the crime than other participants does not render him a "minor participant"; only if he was substantially less culpable than the others involved does he qualify for the two-level reduction. *E.g., United States v. Brown,* 136 F.3d 1176, 1185 (7th Cir.1998); *United States v. McClinton,* 135 F.3d 1178, 1190 (7th Cir. 1998). Determining an individual defendant's relative culpability is a factual assessment turning on the particular circumstances of the case. *Id.* We therefore review the district court's decision to deny Ward the reduction for clear error only. *Id.*

■ We reject Ward's threshold suggestion that the district court never ruled on his request for the minor-participant reduction and that a remand is therefore in order. Ward had filed written objections to the presentence report which contended, inter alia, the probation officer had erred in not granting him the reduction. At sentencing, Ward's counsel reiterated his objection (Tr.

---

**6.** The third consideration articulated by *Place*—the information provided to the suspect, 462 U.S. at 710, 103 S.Ct. at 2646—is, as the district court noted and as Ward himself agrees, irrelevant in this case. *See Ward,* 928 F.Supp. at 1436 & n. 16; *LaFrance,* 879 F.2d at 9.

March 18, 1997 at 59–60), and the court indicated that it would address the objection momentarily (*id.* at 60). Shortly thereafter, the court indicated that it was about to announce its tentative findings, "which will incorporate effectively the rulings on these matters that remain outstanding." *Id.* at 67–68. The court proceeded to outline its calculation of the offense level, and in so doing neither granted nor made mention of a two-level reduction pursuant to section 3B1.2(b). *See id.* at 68–71. The most natural and reasonable reading of the record is that the court considered Ward's objection but overruled it without comment. That is consistent with the pre-sentence report, which in an addendum labeled "Court Findings" indicates that the objection was overruled. PSR, Court Findings ¶ 17. In any case, the court gave the parties the opportunity to object to its tentative findings before making them final. Tr. March 18, 1997 at 71. If Ward and his counsel believed that the court had failed to consider the minor-participant reduction, that was the time to speak up. No objection was voiced, however. *Id.*

We find no clear error in the refusal to grant Ward the reduction; in fact, the career offender provision of the Guidelines precluded such a reduction in this case. The table set forth in section 4B1.1(A) specified an offense level of 37 for Ward unless the offense level otherwise applicable were greater, which it was not. A footnote to the career offender table indicates that the specified offense level may be decreased to account for the defendant's acceptance of responsibility (U.S.S.G. § 3E1.1), but does not indicate that other Chapter 3 adjustments, including those for the defendant's role in the offense, may be used to increase or decrease the offense level specified by the career offender table. *See* U.S.S.G. § 4B1.1 n.\*. Singling out the acceptance of responsibility reduction would, of course, have been unnecessary if all Chapter 3 adjustments could be applied to an offense level specified by section 4B1.1. That the guideline affirma-

tively embraces the section 3E1.1 adjustment therefore suggests that other Chapter 3 adjustments do not apply. *See United States v. Koonce,* 991 F.2d 693, 698 (11th Cir.1993). In fact, commentary accompanying the 1989 amendment adding the footnote to the offense level table set out in section 4B1.1 explains:

> The purpose of this amendment is to *authorize* the application of § 3E1.1 (Acceptance of Responsibility) to the determination of the offense level under this section to provide an incentive for the acceptance of responsibility by defendants subject to the career offender provision.

U.S.S.G.App. C. Amendment 266 (Effective November 1, 1989) (emphasis supplied). The language of this note confirms that in the absence of express authorization, Chapter 3 adjustments do not apply to the offense levels specified by section 4B1.1. *See United States v. McCoy,* 23 F.3d 216, 218 (9th Cir. 1994) (per curiam). Because the guideline expressly permits an adjustment for acceptance of responsibility but no other Chapter 3 adjustment, a reduction for the defendant's minor or minimal role in the offense is precluded. *United States v. Beltran,* 122 F.3d 1156, 1160 (8th Cir.1997), citing *United States v. McNeil,* 90 F.3d 298, 300 (8th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996); *McCoy,* 23 F.3d at 218.[7] Our contrary dictum in *United States v. Hernandez,* 79 F.3d 584, 598 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 2407, 138 L.Ed.2d 173, 174 (1997), which dealt with an entirely different question, is not authoritative and should be disregarded.

## IV.

Finding no error in the denial of Ward's motion to suppress and his request for a minor-participant reduction in his offense level, we AFFIRM his conviction and sentence.

---

7. Of course, in ascertaining whether the offense level "otherwise applicable" might be greater than the offense level specified by section 4B1.1 (in which case the former would be used), any pertinent Chapter 3 adjustments (including adjustments for the defendant's role in the offense) would be referenced to determine what the "otherwise applicable" offense level might be. *See, e.g., United States v. Unthank,* 109 F.3d 1205, 1208 (7th Cir.1997); *United States v. Linnear,* 40 F.3d 215, 217–18 & n. 1 (7th Cir.1994).